UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALEXIS CORRIGAN,<br><br>        Plaintiff,<br><br>-against-<br><br>POLO RALPH LAUREN,<br><br>        Defendant. | CIVIL ACTION NO:<br>3-03 CV 0230 (SRU)<br><br><br><br>DECEMBER 23, 2004 |

**RULE 56.1 STATEMENT
OF UNDISPUTED FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, Defendant Polo Ralph Lauren Corporation ("Polo" or "Defendant"), by and through its undersigned counsel, submit the within Statement of Undisputed Facts[1]:

1. Plaintiff was employed as an Account Executive in Defendant's Golf Division from August 1996 through December 6, 2002. *See* Amended Complaint ("Compl."), ¶12, 13.

2. In connection with the birth of her child, Plaintiff took a leave of absence pursuant to the Federal and Connecticut Family and Medical Leave Act from August 1, 2002 through November 1, 2002. Compl. ¶7.

3. Plaintiff was supervised by Andrew Bell (from 2000 through March 31, 2002) and Scott Mahoney (from April 1, 2002 through her discharge). *See* Deposition of Alexis Corrigan ("Pl. Tr."), Tr. 11:5-21, annexed to the Declaration of Christina L. Feege (the "Feege Dec.") as Exh. A.

---

[1] The facts herein are undisputed for purposes of this motion only.

4. As an Account Executive, Plaintiff's job responsibilities were to sell wholesale golf apparel and accessories to golf clubs and other retailers, to service those accounts as needed, and to open new accounts, consistent with Polo's brand image. *See* Polo Ralph Lauren Job Description, D00129-31, annexed to the Feege Dec. as Exh. E.

5. Among other duties, Plaintiff's position required at least six in-store visits a year to assist each account with merchandising, inventory checks and sales assistance, as well as regular telephone contact with each account. *See* Polo Ralph Lauren Job Description, D00129-131, annexed to the Feege Dec. as Exhibit E.

6. At least four days of travel per week during Defendant's busy selling seasons has been a requirement for Plaintiff's position since at least 1997. Pl. Tr. 62: 7-10; Deposition of Scott J. Mahoney (the "Mahoney Tr."), annexed to the Feege Dec. as Exh. B, 101:15-25; 102:1.

7. Plaintiff does not know whether it is the norm for Account Executives in Polo's Golf Division to travel for business four days a week during prime selling seasons. Pl. Tr. 60:12-15.

8. During her tenure with Defendant, Plaintiff annually sold to and serviced approximately 100-110 different accounts in her assigned territory, which covered the New England area, part of New York State and Southern Connecticut. Compl. ¶12.

9. During the last year of Plaintiff's employment, the Golf Division employed 17 Account Executives, each of whom covered a distinct geographic area. *See* Organizational Chart, D00061, annexed to the Feege Dec. as Exh. E.

10. Plaintiff worked in what was commonly referred to as the "Northeast," along with fellow Account Executives Michael MacFarlane and Denny DeMarino; this area covered accounts located from New Jersey to Maine. Deposition of Andrew Bell (the "Bell Tr."), annexed to the Feege Dec. as Exh.C, 52:5-9; 181:21-25;182:1.

11. Prior to August 2002, Mr. MacFarlane's territory encompassed New Jersey and part of New York State, Mr. DeMarino covered the metropolitan New York City area, and Ms. Corrigan had responsibility for New England and Southern Connecticut. Deposition of Michael MacFarlane (the "MacFarlane Tr."), annexed to the Feege Dec. as Exh. D, p 49-52.

12. From 2000 through 2002, the Golf Division's overall sales and profits were declining. Bell Tr. 108:18-25; 109:2-5.

13. The Golf Division has from time-to-time consolidated, when feasible, geographic territories in order to reduce payroll expenses and/or to increase efficiencies. For example, in 1999, the Division's Florida territory was consolidated from three to two territories, and one employee was laid off as a result. Bell Tr. 11-25; 55:2-21.

14. The only employees that Defendant considered for layoff in connection with the consolidation of the Florida territory were Karen Emdee (f), Jamie Shephard (m) and Roger Morgan (m), all of whom were Account Executives working in the Florida market. Bell Tr. 56:15-25.

15. When Ms. Emdee was selected for layoff, her position was eliminated and her accounts were distributed between Messrs. Shephard and Morgan. *Id.*

16. At the time of her layoff, Ms. Emdee was not offered another position, either within the Golf Division or elsewhere in the Company. Bell Tr. 56:12-14.

17. In 2001, Mr. Bell suggested that the Division could reduce expenses by consolidating the territories located in the Southwest, Midwest and Northeast, thereby reducing the number of Account Executives on the Division's payroll. Bell Tr. 45:21-25; 46:1-8.

18. John Kirwan, Bell's supervisor, agreed with this assessment, and authorized Mr. Bell to move forward with these territory consolidations. Bell Tr. 42: 8-25; 43:2-8.

19. Accordingly, in 2001, the Golf Division consolidated the two territories in the Southwest to one, eliminating one Account Executive position in Arizona in the process. Bell Tr. 23-25; 44:2-8.

20. In deciding which Account Executive to layoff in connection with this consolidation, the Company followed the same procedure it had used in Florida; it reviewed the performance of the two Account Executives who were working in the geographic area to be consolidated, Karmyn Heilmann (f) and Lee Smith (m). *See* Corporate documents concerning this consolidation, D00893, D00901-D00905, annexed to the Feege Aff. as Exh. E

21. As between Mr. Smith and Ms. Heilmann, Ms. Heilmann was viewed as the stronger Account Executive, so Mr. Smith was laid off, and the majority of his accounts were reallocated to Ms. Heilmann. *Id.*

22. At the time Mr. Smith was discharged, he was not offered a transfer to another position within the Company. Bell Tr. 44:23-25.

23. The Midwest territory was also consolidated sometime in 2001. No discharges were necessary in connection with this consolidation because one of the Account Executives working in the Midwest, Todd Fontaine, resigned prior to the planned consolidation. Bell Tr. 49:14-20.

24. In connection with the consolidation of the territory in the Midwest, Mr. Bell simply eliminated Mr. Fontaine's position and distributed his accounts to the remaining Account Executives working in the region. Bell Tr. 50:6-25.

25. During the late Summer of 2002, John Kirwan instructed Mr. Mahoney, as part of his annual review, to move forward with the consolidation of the Northeast territories. Mahoney Tr. 191-194; 213: 9-23; see Affidavit of Kate Mahon-Snow (the "Snow Aff."), ¶10 and Exh. C. This course of action is documented in Mr. Mahoney's annual "goal setting worksheet" for the coming Fiscal Year 2003, as well as in his Fiscal Year 2003 performance evaluation. Snow Aff., Exh. C.

26. Mr. Mahoney and Mr. Kirwan discussed the consolidation plan at a meeting with Human Resources held in August 2002. Snow Aff., ¶3. At that meeting, Human Resources officials approved the plan to consolidate, but noted that a specific position could not be eliminated until a "Peer Selection Review and Analysis" had been completed, which is the tool that Polo uses to select employees for layoff, and the consolidation plan was approved by Joy Herfel, the Company's President. Snow Aff., ¶3.

27. In the Fall of 2002, Kate Mahon-Snow, a Senior Director – Human Resources, completed a Peer Group Ranking and Selection for the individuals working in the Northeast region. Snow Aff., ¶4 and Exh. A.

28. Mr. MacFarlane and Mr. DeMarino were selected as Ms. Corrigan's peers because it is Polo's practice when consolidating territories in the Golf Division to consider for layoff only those employees who are currently working in the geographic region that is to be impacted by the proposed realignment. Mahoney Tr. 246:23-247:4; Snow Aff., ¶4; Feege Dec., Exh. E.

29. As part of the selection process, Mahon-Snow reviewed information from Corrigan, MacFarlane and DeMarino's human resources files, as well as information provided by Messrs. Mahoney and Kirwan, all of which was used to rate the three employees working on a variety of job-related categories, such as length of service, level of experience, skills and aptitude, and current job performance. Snow Aff., ¶4.

30. Based on the information provided to Snow, she assigned Denny DeMarino an overall score of "21," with scores of "outstanding" or "above average" in every category, based on his historical performance as the Division's top salesperson. Snow Aff., ¶5.

31. In addition, Snow considered the fact that DeMarino had never received a poor performance review nor had he ever had any performance problems of note. Snow Aff., ¶5.

32. Ms. Corrigan's other peer, Michael McFarlane, received a total score of "15," having received scores of "above average" in both the "current job performance" and "skills and aptitude" categories. Snow Aff., ¶6 and Exh. A.

33. These scores were based on the fact that Mr. MacFarlane had received ratings of "meets expectations" on his last performance evaluation, had strong sales, and like Mr. DeMarino, had never generated any customer complaints. Snow Aff.. ¶6.

34. Ms. Corrigan received an overall score of "11" on the Peer Selection Review and Analysis. Snow Aff., ¶7 and Exh. A. This score reflected ratings of "marginal" in the substantive areas of "current performance" and "skills and abilities." Snow Aff., ¶7 and Exh. A. With Mahoney's input, Snow assigned these scores based on the following factors: (a) Corrigan had received an overall score of "Development Needed" on both her 2001 and 2002 performance evaluations, which had been completed by two separate

managers; (b) Corrigan's failure to meet her sales targets on a yearly basis; (c) the general lack of growth in her territory; and (d) the number of customer complaints that the Company had received over the years concerning Ms. Corrigan.

35. Plaintiff received an overall rating of "development needed" on her Fiscal Year 2001 and Fiscal Year 2002 annual performance evaluations. Snow Aff., ¶5 and Exh. B.

36. Mr. Bell originally gave Ms. Corrigan an overall score of "meets expectations" on her Fiscal Year 2002 performance review. After observing Ms. Corrigan's performance, Mr. Mahoney changed Ms. Corrigan's score to a "development needed. " Mr. Mahoney also changed Mr. Bell's overall rankings for Karmyn Heilmann (f, non-pregnant), and Eric Christie (m) based on his own personal assessment of their performance. Mahoney Tr. 150:9-20; Snow Aff. ¶3 and Exh. B.

37. Plaintiff did not meet her annual sales targets in Fiscal Years 1997, 1998, 2001, or 2002. *See* documents numbered P200, P264 annexed to the Feege Dec, as Exh. E; see also Plaintiff's Fiscal Year 2001 and Fiscal Year 2002 performance evaluations, annexed to the Snow Aff., Exh. B.

38. Plaintiff exceeded the Division's goals for returned merchandise in Fiscal Years 1997, 1998, 2001, or 2002. In Fiscal Year 2002, Plaintiff's returns were 16.4% of sales for menswear and 20.5% of sales for women's wear, compared with a goal of 7.3% of sales. *See* documents numbered P200, P264 annexed to the Feege Dec, as Exh., F; see also Plaintiff's Fiscal Year 2001 and Fiscal Year 2002 performance evaluations, annexed to the Snow Aff., Exh. B.

39. Mike McFarlane exceeded his volume commitments in Fiscal Year 2002, and had actual returns of 7.5% of sales, compared with a goal of 7.3%. D0187-188, annexed to the Feege Dec. at Exh. E.

40. Mike MacFarlane has never received an overall rating of "development needed" on an annual performance evaluation. Snow Aff., ¶5.

41. Denny DeMarino exceeded his volume commitments in Fiscal Year 2002 by more than a million dollars, and had actual returns of 7.3% of sales, which was on par with a goal of 7.3%. D01239, annexed to the Feege Dec. at Exh. E.

42. Denny DeMarino has never received overall rating of "development needed" on an annual performance evaluation. Snow Aff., ¶5.

43. Because Ms. Corrigan's ranked the lowest among her peers on the Peer Group Ranking, Ms. Snow and Mr. Mahoney concluded that if a position was to be eliminated, it would be Ms. Corrigan's. Snow Aff., ¶7.

44. Ms. Corrigan received complaints about her service from customers in 2000, 2001 and 2002. D1023-1070; D809-816; D180-186, annexed to the Feege Aff. as Exh., F.

45. Neither Mr. DeMarino nor Mr. MacFarlane had received a similar level of complaints concerning their performance. Snow Aff., ¶5.

46. The Peer Group Ranking and Selection concerning the consolidation of the Northeast was completed in late October 2002, at which point the Golf Division sought Joy Herfel's approval to eliminate Ms. Corrigan's position. Mahoney Tr. 208:13-25; Snow Aff., ¶8.

47. However, because Ms. Corrigan was slated to return to work from FMLA leave during the following week, the Human Resources department decided that if Ms. Herfel's approval was not forthcoming by the time Ms. Corrigan returned on November 4th, Mr.

Mahoney would deliver Ms. Corrigan's annual review as written, and place her on a 90-day performance plan. Snow Aff., ¶8; Mahoney Tr. 189:17-24, 212: 8-15.

48. This decision was made to ensure that Ms. Corrigan would know what the expectations would be for her performance going forward, in the event that her position was not eliminated. Snow Aff., ¶8.

49. Ms. Herfel had not approved the consolidation of the Northeast by the time Ms. Corrigan returned to work on November 4, 2002. Snow Aff., ¶8; Mahoney Tr. 212: 8-15.

50. Mr. Mahoney delivered Ms. Corrigan's performance review on November 7, 2002, and placed her on a 90-day performance plan at that time. Snow Aff., ¶9; Mahoney Tr. 211:24-25.

51. Within days after Ms. Corrigan returned to work, Ms. Herfel gave her approval for the plan to consolidate the Northeast and to eliminate Ms. Corrigan's position. Snow Aff., ¶ 9; Mahoney Tr. 252:6-22.

52. Ms. Corrigan was informed that her position was being eliminated on November 12, 2002, after which she continued to work for the next three weeks, through December 6th. Snow Aff., ¶9; Mahoney Tr. 11:13-25; 12:1.

53. Following Ms. Corrigan's discharge, her position was eliminated and the majority of her accounts were permanently reassigned to Messrs. McFarlane and DeMarino, who continue to service these accounts today. Mahoney Tr. 9:1-25; MacFarlane Tr. 14:2-13.

54. The elimination of Plaintiff's position reduced the number of Account Executives working in the Northeast from three to two, and the overall Account Executive head count from 17 to 16. *See* "11/03 Organizational Chart", D00633, Feege Dec., Exh. E.

55. Polo has not hired a replacement for Ms. Corrigan since her discharge in 2002, and Messrs. DeMarino and McFarlane remain the only two Account Executives servicing this geographic area. *Id.*

56. Plaintiff is unaware of any employees, male or female, who were treated more favorably than was she at the conclusion of her FMLA leave. Corrigan Tr. 89: 8.

57. In 2002, Mr. Mahoney was concerned that Plaintiff and the other account executives around the country were not seeing enough of their customers. Due to this concern, Mr. Mahoney told his Account Executives that they should have one day in the office each week, with the remaining four days on the road, visiting accounts. Pl. Tr. 101:15-25; 102:1.

58. "VR Link" is a computer system that allows Polo Account Executives to input customer orders remotely and to monitor the progress of each such order. VR Link is password-based and only allows employees to access information about accounts in their own territory. Pl. Tr. 80:13-19.

59. When Mr. MacFarlane took over responsibility for Ms. Corrigan's accounts at the beginning of her leave, her access to VR Link was closed and her accounts were transferred to Mr. MacFarlane's employee number so that he could input orders in her absence. *Id.*

60. At the time Plaintiff returned to work, Plaintiff had no orders to key into VR Link. Pl. Tr. 118: 5-9.

61. Plaintiff desired access to VR Link when she returned to work so that she could ascertain the level of activity for each of her accounts during her absence, and to design a plan of action going forward. Pl. Tr. 118: 9-15.

62. An alternate system, "System A" contains information concerning the status of every account in the country, including Plaintiff's, containing up-to-date information on orders that have been entered, expected delivery times and other pertinent information. Mahoney Tr. 203:15-25.

63. Although Plaintiff had access to System A upon her return to work, it was not Plaintiff's preferred method for tracking the status of her accounts' orders. Pl. Tr. 119: 21.

Dated: New York, New York
December 23, 2004

LITTLER MENDELSON, P.C.

By: _____
Christina L. Feege (Fed. Bar No. CT24872)
Attorneys for Defendant
885 Third Avenue - 16th Floor
New York, New York 10022
(212) 583-9600
cfeege@littler.com