## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ALEXIS CORRIGAN,

          Plaintiff,

    -against-

POLO RALPH LAUREN,

          Defendant.

CIVIL ACTION NO:
3-03 CV 0230 (SRU)

DECEMBER 23, 2004

---

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

---

**LITTLER MENDELSON, P.C.**
**Attorneys for Defendant**
**885 Third Avenue – 16th Floor**
**New York, New York 10022**
**(212) 583-9600**

*Of Counsel:*
Christina L. Feege, Esq. (Fed. Bar No. CT24872)

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................ 1

FACTS ................................................................................................................................ 2

    A.    Plaintiff's Employment History With Defendants.................................. 2

    B.    The Structure of the Golf Division and its History of Territory
        Consolidations............................................................................................. 3

ARGUMENT ...................................................................................................................... 9

    A.    Summary Judgment Is Appropriate In Employment Cases ..................... 9

    B.    Plaintiff Cannot Prove A Violation Of Defendant's Reinstatement
        Obligations Under The FMLA Or Connecticut Law ............................... 9

    C.    Plaintiff Has No Evidence To Support Her Claims Of Gender Or
        Pregnancy Discrimination Or FMLA Retaliation................................... 12

        1.    No Inference of Discrimination or Retaliation Can be Drawn ................ 14

    D.    Polo's Legitimate Non-Discriminatory Reason For Discharging Corrigan ........ 17

    E.    There Is No Evidence of Pretext.............................................................. 17

CONCLUSION ................................................................................................................. 18

## TABLE OF AUTHORITIES

**Page**

### CASES

*Abdu-Brisson v. Delta Air Ln., Inc.*,
   239 F.3d 456, 465-66 (2d Cir. 2001) ................................................................. 9

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 247 (1986) ........................................................................... 9, 16

*Bond v. Sterling, Inc.*,
   77 F. 3d 300, 304 (N.D.N.Y. 1999) ................................................................ 16

*Bruno v. Sonalysts, Inc.*,
   2004 U.S. Dist. LEXIS 23848, *15  (D. Ct. November 23, 2004) ...................... 11, 12, 13, 17

*Dilegge v. Gleason*,
   131 F. Supp. 2d 520, 521 (S.D.N.Y. 2001) ........................................................ 9

*Dister v. Continental Group, Inc.*,
   859 F.2d 1108, 1116 (2d Cir. 1988) ................................................................ 18

*Jones v. Green Chevrolet Jeep Eagle*,
   166 F.Supp 2d 64, 68 (D. Conn., 2004) ............................................................ 13

*Kerzer v. Kingly Mfg.*,
   156 F.3d 396, 401-02 (2d Cir. 1998) ............................................................... 13

*Mauro v. Southern New England Telecomm.*,
   46 F. Supp. 2d 181, 188 (D. Conn. 1999) ......................................................... 18

*McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973) ...................................... 12, 13

*Mesnick v. General Elec. Co.*,
   950 F.2d 816, 825 (1st Cir. 1991) .................................................................. 11

*Potenza v. City of New York*,
   365 F.3d 165 (2d Cir. 2004) .......................................................................... 12

*Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995) .................................... 13

*Valenti v. Carten Indus.*,
   1997 U.S. Dist. Lexis 19722, *8 (D. Conn. 1997) ............................................. 17

### STATUTES

29 C.F.R. § 825.216(a) ................................................................................ 10

29 U.S.C. § 2614(a)(3)(B) ............................................................................ 10

Title VII and § 46(a)-60(a) 7(d)
   of the Connecticut General Statutes ............................................................. 12

## PRELIMINARY STATEMENT

In August 2002, Alexis Corrigan ("Plaintiff" or "Corrigan"), a former employee of Defendant Polo Ralph Lauren Corporation ("Defendant" or "Polo"), was granted a thirteen-week leave of absence from work due to a pregnancy-related disability and a subsequent childbirth. Following this leave of absence, Plaintiff returned to work on November 4, 2002, and was discharged approximately a month later when her position as an Account Executive in Defendant's Golf Division was eliminated. In this action, Plaintiff asserts that she was discharged due to her pregnancy, gender and/or in retaliation for taking a leave of absence pursuant to the federal and Connecticut Family and Medical Leave Act ("FMLA"), and that Defendant also violated its reinstatement obligations under both sets of FMLA laws.

The fundamental problem with Plaintiff's claims of differential treatment is that they are founded upon Plaintiff's personal assumptions about the way Defendant does (or should do) business, none of which have been borne out in the record. For example, while Plaintiff accused her manager, Scott Mahoney, of imposing stricter travel requirements and other work rules on her, the undisputed evidence establishes that Mr. Mahoney applied the same standards to all of Defendant's Account Executives. Likewise, while Plaintiff assumed at the outset of this litigation that her position was singled out for elimination for discriminatory and/or retaliatory reasons, the record unequivocally establishes that Plaintiff's job was eliminated as part of a series of sales territory consolidations, all of which were planned well before Plaintiff became pregnant and/or took FMLA leave. The record is replete with other, similar assumptions on Ms. Corrigan's part have proven to be without merit.

The truth is, with the parties' extensive discovery now complete, Plaintiff has simply been unable to transform her conclusory allegations of discrimination and retaliation into triable

issues of fact. As set forth in greater detail below, she has been wholly unable to establish a connection between her protected status or activity and her discharge, and she has also failed to establish that Defendant's stated was pretextual. Given this record, summary judgment dismissing Plaintiff's Amended Complaint in its entirety is warranted.

## FACTS

### A.    Plaintiff's Employment History With Defendants

Plaintiff was employed as an Account Executive in Defendant's Golf Division from August 1996 through December 6, 2002. *See* Amended Complaint ("Compl."), ¶12, 13. At all times relevant to this action, Plaintiff was supervised by Andrew Bell (from 2000 through March 31, 2002) and Scott Mahoney (from April 1, 2002 through her discharge). *See* Deposition of Alexis Corrigan ("Pl. Tr."), Tr. 11:5-21, annexed to the Declaration of Christina L. Feege (the "Feege Dec.") as Exh. A. John Kirwan, the Senior Vice President of Specialty & Golf Division, managed the Golf Division and supervised both Mr. Bell and Mr. Mahoney, and indirectly, the Plaintiff. Mr. Kirwan reported to the President of Polo's Menswear business, Joy Herfel, until he resigned in 2003.

As an Account Executive, Plaintiff's job responsibilities were to sell wholesale golf apparel and accessories to golf clubs and other retailers, to service those accounts as needed, and to open new accounts, consistent with Polo's brand image. *See* Polo Ralph Lauren Job Description, D00129-131, annexed to the Feege Dec. as Exhibit F. Among other duties, this position required at least six in-store visits a year for to assist each account with merchandising, inventory checks and sales assistance, as well as regular telephone contact with each account. *Id.* Because an Account Executive's territory usually covered multiple states, this requirement amounted to at least four days of travel per week during Defendant's busy selling seasons. Pl.

2

Tr. 61: 3-22; Deposition of Scott J. Mahoney (the "Mahoney Tr."), annexed to the Feege Dec. as Exh. B, 101:15-25; 102:1. This requirement applied to Plaintiff, who annually sold to and serviced approximately 100-110 different accounts in her assigned territory, which covered the New England area, part of New York State and Southern Connecticut. Compl. ¶12.

**B.**    **The Structure of the Golf Division and its History of Territory Consolidations**

During the last year of Plaintiff's employment, the Golf Division employed 17 Account Executives, each of whom covered a distinct geographic area. *See* Organizational Chart, D00631, annexed to the Feege Dec. as Exh. E. Managers in the Golf Division typically referred to these areas by their regional name (*i.e.* the "Southwest"), each of which was comprised of several different adjacent territories. (*See* map entitled "Polo Golf Ralph Lauren Sales Territories with Consolidations," D00895; annexed to the Feege Dec. as Exhibit F.) Plaintiff worked in what was commonly referred to as the "Northeast," along with Michael MacFarlane and Denny DeMarino; this area covered accounts located from New Jersey to Maine. Deposition of Andrew Bell (the "Bell Tr."), annexed to the Feege Dec. as Exh.C, 52:5-9; 181:21-25;182:1. Prior to the time they took over responsibility for Ms. Corrigan's accounts, Mr. MacFarlane's territory encompassed New Jersey and part of New York State, Mr. DeMarino covered the metropolitan New York City area, and Ms. Corrigan had responsibility for New England and Southern Connecticut. Deposition of Michael MacFarlane (the "MacFarlane Tr."), annexed to the Feege Dec. as Exh. D, p 49-52.

From 2000 through 2002, the Golf Division's overall sales and profits were declining. Bell Tr. 108:18-25; 109:2-5. Accordingly, from time-to-time and when feasible, Defendant has consolidated geographic territories in order to reduce payroll expenses and/or to increase efficiencies. For example, in 1999, the Division's Florida territory was consolidated from three

to two territories, and one employee was laid off as a result. Bell Tr. 54:11-25; 55:2-21. Notably, the only employees that Mr. Bell and Mr. Kirwan considered for layoff at this time were Karen Emdee (f), Jamie Shephard (m) and Roger Morgan (m), all of whom were Account Executives working in the Florida market. Bell Tr. 56:15-25. When Ms. Emdee was selected for layoff, her position was eliminated and her accounts were distributed between Messrs. Shephard and Morgan. *Id.* At the time of her layoff, Ms. Emdee was not offered another position, either within the Golf Division or elsewhere in the Company. Bell Tr. 56: 12-14.

The following year, Mr. Bell suggested that the Division could reduce expenses by consolidating the territories located in the Southwest, Midwest and Northeast, thereby reducing the number of Account Executives on the Division's payroll. Bell Tr. 45: 21-25; 46:1-8. Mr. Kirwan agreed with this assessment, and authorized Mr. Bell to move forward with these territory consolidations. Bell Tr. 42: 8-25; 43:2-8. Accordingly, in 2001, the Golf Division consolidated the two territories in the southwest to one, eliminating one Account Executive position in Arizona in the process. Bell Tr. 43:23-25; 44:2-8. In deciding which Account Executive to layoff in connection with this consolidation, the Company followed the same procedure it had used in Florida; it reviewed the performance of the two Account Executives who were working in the geographic area to be consolidated, Karmyn Heilmann (f) and Lee Smith (m). *See* Corporate documents concerning this consolidation, D00893, D00901-D00905, annexed to the Feege Aff. As Exh. E. As between these two employees, Ms. Heilmann was viewed as the stronger Account Executive, so Smith was laid off, and the majority of his accounts were reallocated to Ms. Heilmann. *Id.* At that time, Mr. Smith was not offered a transfer to another position within the Company. Bell Tr. 44:23-25.

4

The next territory to be consolidated was in the Midwest region. Fortunately, however, one of the Account Executives working in the Midwest, Todd Fontaine, resigned at or about the time that Mr. Bell was gearing up to consolidate this territory, so no Account Executives were laid off as a result of this territory realignment. Bell Tr. 49:14-20. Instead, Mr. Bell simply eliminated Mr. Fontaine's position and distributed his accounts to the remaining Account Executives working in the region. Bell Tr. 50:6-25.

Accordingly, by the time Mr. Mahoney took over responsibility for the Golf Division from Mr. Bell in 2002, the only territory that remained to be consolidated was the Northeast, where Ms. Corrigan, Mr. MacFarlane and Mr. DeMarino were assigned. Therefore, during the late Summer of 2002, John Kirwan instructed Mr. Mahoney, as part of his annual review, to move forward with this consolidation. Mahoney Tr. 191-194; 213: 9-23; *See* Affidavit of Kate Mahon-Snow (the "Snow Aff."), ¶ 10 and Exh. C. This course of action is documented in Mr. Mahoney's annual "goal setting worksheet" for the coming Fiscal Year 2003, as well as in his Fiscal Year 2003 performance evaluation. Snow Aff., Exh. C.

Thereafter, Mr. Mahoney and Mr. Kirwan discussed the consolidation plan at a meeting with Human Resources held in August 2002. Snow Aff., ¶ 3. At that meeting, Human Resources officials approved the plan to consolidate, but noted that a specific position could not be eliminated until a "Peer Selection Review and Analysis" had been completed, which is the tool that Polo uses to select employees for layoff, and the consolidation plan was approved by Joy Herfel, the Company's President. Snow Aff., ¶3.

Accordingly, in the Fall of 2002, Kate Mahon-Snow, a Senior Director – Human Resources, completed a Peer Group Ranking and Selection for the individuals working in the Northeast region. Snow Aff., ¶ 4 and Exh. A. As part of this process, Mahon-Snow reviewed

5

information from Corrigan, MacFarlane and DeMarino's human resources files,[1] as well as information provided by Messrs. Mahoney and Kirwan, all of which was used to rate the three employees working on a variety of job-related categories, such as length of service, level of experience, skills and aptitude, and current job performance.[2]  Snow Aff., ¶ 4.  Based on the information provided to Snow, she assigned Denny DeMarino an overall score of "21," with scores of "outstanding" or "above average" in every category, based on his historical performance as the Division's top salesperson.  Snow Aff., ¶ 5.  In addition, Snow considered the fact that DeMarino had never received a poor performance review nor had he ever had any performance problems of note.  Snow Aff., ¶ 5.

Ms. Corrigan's other peer, Michael McFarlane, received a total score of "15," having received scores of "above average" in both the "current job performance" and "skills and aptitude" categories.  Snow Aff., ¶ 6 and Exh. A.  These scores were based on the fact that Mr. MacFarlane had received ratings of "meets expectations" on his last two performance evaluations, had strong sales, and like, Mr. DeMarino, had never generated any customer complaints.  Snow Aff.. ¶ 6.  Given his strong scores in these substantive areas, MacFarlane would have received a higher overall grade, but for his relative lack of service with the Company, which at that time was under 3 years.  Snow Aff., ¶ 6.

---

[1] These files contained performance evaluations, salary histories, and other personal information.

[2] Mr. MacFarlane and Mr. DeMarino were selected as Ms. Corrigan's peers because it is Polo's practice when consolidating territories to consider for layoff only those employees who are currently working in the geographic region that is to be impacted by the proposed realignment. Mahoney Tr. 246:23-247:4; Snow Aff., ¶4; Feege Dec., Exh. E.  That way, the accounts of the laid off employee can easily be distributed among the remaining Account Executives in the region, without the need to relocate or transfer other Account Executives from around the country.  While Ms. Corrigan has suggested that the Company should have laid off the weakest of the 17 Account Executives, then eliminate a position in the Northeast and transfer Ms. Corrigan to fill the position of the laid off employee, the Golf Division has never used such a procedure.

By contrast, Ms. Corrigan received a low overall score of "11." Snow Aff., ¶ 7 and Exh. B. This score reflected ratings of "marginal" in the substantive areas of "current performance" and "skills and abilities." Snow Aff., ¶ 7. With Mahoney's input, Snow assigned these scores based the following factors: (a) Corrigan had received an overall score of "Development Needed" on both her 2001 and 2002 performance evaluations, which had been completed by two separate managers;[3] (b) Corrigan's failure to meet her sales targets on a yearly basis[4]; (c) the general lack of growth in her territory; and (d) the number of customer complaints that the Company had received over the years concerning Ms. Corrigan.[5] These low scores were buttressed by scores of "outstanding" or "above average" in the categories dealing with her years of service (she had been with the company since 1996) and her overall tenure in the golf industry, but a high score in these areas was not enough to significantly increase Ms. Corrigan's overall score. Accordingly, because Ms. Corrigan ranked the lowest among her peers on the Peer Group Ranking, Ms. Snow and Mr. Mahoney concluded that if a position was to be eliminated, it would be Ms. Corrigan's.

Once the Peer Group Ranking and Selection was completed in late October 2002, the Golf Division sought Ms. Herfel's approval to eliminate Ms. Corrigan's position. Mahoney Tr. 208:13-25; Snow Aff., ¶ 8. However, because Ms. Corrigan was slated to return to work during the following week, the Human Resources department decided that if Ms. Herfel's approval was not forthcoming by the time Ms. Corrigan returned, Mr. Mahoney would deliver Ms. Corrigan's

---

[3] It should be noted that Mr. Mahoney downgraded Ms. Corrigan's overall score from a "meets expectations" to a "development needed" on her Fiscal Year 2002 performance evaluation. However, she is not the only employee to whom this occurred. In addition to Ms. Corrigan, Mr. Mahoney also changed Mr. Bell's overall rankings for Karmyn Heilman (f), Eric Christie (m) and Roger Morgan (m) based on his own personal assessment of their performance. Mahoney Tr. 150:9-20; Snow Aff. ¶ 3 and Exh. B.
[4] Snow Aff., Exh. B (Corrigan's performance evaluations).
[5] Copies of customer survey documents and other evidence of customer complaints are annexed to the Feege Dec. as Exh. E.

annual review as written, and place her on a 90-day performance plan. Snow Aff., ¶ 8; Mahoney Tr. 189:17-24, 212: 8-15. This decision was made to ensure that Ms. Corrigan would know what the expectations would be for her performance going forward, in the event that her position was not eliminated. Snow Aff., ¶ 8.

As it turned out, this was the course the Company took, because Ms. Herfel had not approved the consolidation of the Northeast by the time Ms. Corrigan returned to work on November 4, 2002. Snow Aff., ¶ 8; Mahoney Tr. 212: 8-15. Accordingly, Mr. Mahoney delivered Ms. Corrigan's performance review on November 7, 2002, and placed her on a 90-day performance plan at that time. Snow Aff., ¶ 9; Mahoney Tr. 211:24-25. Within days thereafter, however, Ms. Herfel gave her approval for the plan to consolidate the Northeast and to eliminate Ms. Corrigan's position. Snow Aff., ¶ 9; Mahoney Tr. 252:6-22. Ms. Corrigan was informed of this decision on November 12, 2002, after which she continued to work for the next three weeks, through December 6th. Snow Aff., ¶ 9; Mahoney Tr. 11:13-25; .12:1

Following Ms. Corrigan's discharge, her position was eliminated and the majority of her accounts were permanently reassigned to Messrs. McFarlane and DeMarino, who continue to service these accounts today. Mahoney Tr. 9:1-25; MacFarlane Tr. 14:2-13. This action reduced the number of Account Executives working in the Northeast from three to two, and the overall Account Executive head count from 17 to 16. *See* "11/03 Organizational Chart", D00633, Feege Dec., Exh. E. Consistent with Mr. Bell's theory that the Northeast could be covered by two Account Executives instead of three, Polo has not hired a replacement for Ms. Corrigan since her discharge in 2002, and Messrs. DeMarino and McFarlane remain the only two Account Executives servicing this geographic area. *Id.*

## ARGUMENT

**A.     Summary Judgment Is Appropriate In Employment Cases**

Summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Abdu-Brisson v. Delta Air Ln., Inc.*, 239 F.3d 456, 465-66 (2d Cir. 2001), *cert. denied*, 534 U.S. 993 (2001); *Dilegge v. Gleason*, 131 F. Supp. 2d 520, 521 (S.D.N.Y. 2001). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the non-movant must come forward with specific facts showing that there is a material factual question that must be resolved at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Because Plaintiff has not and cannot adduce evidence sufficient to establish the essential elements of her claims against Defendant, summary judgment must be granted, dismissing Plaintiff's Amended Complaint against Defendant in its entirety.

**B.     Plaintiff Cannot Prove A Violation Of Defendant's
Reinstatement Obligations Under The FMLA Or Connecticut Law**

In her first and fourth claims for relief, Corrigan asserts that Defendant, in eliminating her position and assigning her responsibilities to other existing Account Executives, failed to reinstate her to her former position, thus violating the FMLA and Connecticut FMLA.

As an initial matter, Plaintiff's claim must fail because she did in fact return to work on November 4, 2002, after 13 weeks of FMLA leave. (Compl., ¶ 15, 29.) Plaintiff remained in this position until December 6, 2002, when her position was officially eliminated. During this time period, Ms. Corrigan was actively involved in the business, selling accounts and engaging

in other work related activity. Given these facts, Plaintiff cannot dispute that she was in fact reinstated to her former position at the conclusion of her leave, albeit for an admittedly short period of time. In so doing, Defendant complied with its reinstatement obligations under federal and state law.

But assuming *arguendo* that Plaintiff was not reinstated, her claim must still fail because the undisputed evidence establishes the Plaintiff's position would have been eliminated even had she not taken a protected maternity leave. While the FMLA prohibits "interference" with an employee's ability to take FMLA leave, the Act and its implementing regulations make clear that an employee has no greater right of reinstatement than if she would have been continuously employed during the leave period. 29 U.S.C. § 2614(a)(3)(B); 29 C.F.R. § 825.216(a).[6] Accordingly, if Ms. Corrigan would have been terminated due to Defendant's territory reorganization in the Northeast regardless of whether she took leave, then Defendant did not violate the FMLA or Connecticut law.[7] The undisputed evidence shows that this was the case.

First, the record irrefutably establishes that Plaintiff's position was in fact eliminated as part of a longstanding plan to reduce expenses by consolidating overstaffed territories. Moreover, there is no question that Plaintiff would have been selected for layoff regardless of her leave. At the time the Peer Group Selection and Analysis was completed, Ms. Corrigan was the

---

[6] Specifically, the FMLA regulations state in part:

An employee has no greater right to reinstate or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. For example: (1) If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise. 29 C.F.R. § 825.216(a).

[7] Section 31-51qq-37 of the Final Regulations, State of Connecticut, Family and Medical Leave Act, dealing with an employer's reinstatement obligations incorporates 29 C.F.R. §§ 825.216(a) and 825.312 in their entirety, except with respect to certain benefits issues, which are not relevant here.

weakest of the three employees working in the Northeast, and thus the logical choice for termination. Significantly, the Company would have come to the same conclusion regardless of when the Peer Group Selection was completed, because Plaintiff's performance trailed her peers in the Northeast throughout her tenure at Polo. Indeed, Corrigan admitted that she was the weakest performer at her deposition, and also admitted that she fell short of MacFarlane and DeMarino in a whole range of job skills. Corrigan Tr. 194: 2-025; 195: 2-5; 197: 4-12. Given these facts and Polo's selection criteria, Plaintiff's layoff was inevitable regardless of her leave or pregnancy status.

In an attempt to counter these facts, Ms. Corrigan contends that the Company should have reviewed the performance of the entire pool of Golf Account Executives to select who was to be laid off, on the theory that she would not have been the worst performer in this wider pool of employees. Corrigan Tr. 197:13-25. However, the law does not require the Company to change its established, neutral procedures simply because Ms. Corrigan was on FMLA leave. *See Bruno* 2004 U.S. Dist. LEXIS 23848, *15 (D. Ct. November 23, 2004) ("Employers need a certain amount of flexibility to organize their companies efficiently, and courts should hesitate before second-guessing their day-to-day personnel decisions"), quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions.").

In this case, Defendant followed the exact same procedure with respect to Ms. Corrigan's layoff that it used with its previous consolidations around the country.[8] As the record now

---

[8] Part of the problem with Plaintiff's claim is it appears to be based on her limited knowledge concerning the facts surrounding previous consolidations. At her deposition, Plaintiff testified that she was not aware of any previous territory consolidations. Pl. Tr. 197:23-25. Moreover, according to Plaintiff, the Golf Division never "just fired" any other employees without offering them another position within the

stands, it is clear that Plaintiff would have fallen short whether or not she took a leave, because her historic job performance was significantly worse than that of her peers, and had been for quite some time. Because Plaintiff has failed to adduce any facts from which a jury could infer otherwise, her claim must be dismissed.

**C.    Plaintiff Has No Evidence To Support Her Claims
       Of Gender Or Pregnancy Discrimination Or FMLA Retaliation**

Ms. Corrigan next complains that Defendant failed to reinstate her/discharged her in December 2002 (i) based on her sex and pregnancy in violation of Title VII and § 46(a)-60(a) 7(d) of the Connecticut General Statutes; [9] and (ii) in retaliation for taking a protected maternity leave. Summary judgment should be granted to Defendant on all of these claims because there is no factual or legal basis to support them.

Because intent is an issue with respect to each of these claims, the now familiar burden-shifting analysis pursuant to *McDonnell Douglas* applies. *Potenza v. City of New York*, 365 F.3d 165 (2d Cir. 2004); *Bruno*, 2004 U.S. Dist. LEXIS 23848.[10]  Under this paradigm, a plaintiff must first establish by a preponderance of the evidence a *prima facie* case of retaliation.  In order to do so, she must establish that: 1) she exercised rights protected under the FMLA; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id.*  This same analytical framework applies (with minor variations) with respect to Plaintiff's

---

Company. Corrigan Tr.198:2-10.  As Mr. Bell and Ms. Snow have testified, Plaintiff's understanding of the facts is incorrect.
[9] Under Connecticut law, a private employer may not "fail or refuse to reinstate the employee to her original job or to an equivalent position with equivalent pay and accumulated seniority, retirement, fringe benefits and other service credits upon her signifying her intent to return [from maternity leave] unless, in the case of a private employer, the employer's circumstances have so changed as to make it impossible or unreasonable to do so." C.G.S. 46(a)-60(a) 7(d).
[10] This same framework applies to retaliation claims asserted under the Connecticut Family Leave Act. *Bruno*, at *4.

Title VII and Connecticut state law claims of gender and pregnancy discrimination.[11] *Jones v. Green Chevrolet Jeep Eagle,* 166 F.Supp 2d 64, 68 (D. Conn., 2004).

After a plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to put forth a legitimate, non-retaliatory explanation for the challenged employment decision. *See McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973). Once this has been done, the burden shifts back to the Plaintiff to prove that the proffered reason for her discharge is not only false, but also that unlawful discrimination or retaliation was the true motivation for Defendant's actions. *Bruno,* at *12.

Here, Defendant does not dispute that Plaintiff has satisfied the first three elements of her *prima facie* case: she was a pregnant woman and she took a protected FMLA leave; she was minimally qualified for the position of Account Executive; and she was discharged. However, Plaintiff cannot satisfy the final element of her *prima facie* case: *i.e.,* that there is a connection between her protected status or activity and her discharge. Even if Plaintiff could state a *prima facie* case, summary judgment is still warranted because Defendant has a legitimate non-discriminatory reason for its decision and there is no evidence of pretext.

1.    **No Inference of Discrimination or Retaliation Can be Drawn**

In order to prevail on her claims under state and federal law, Corrigan must provide some evidence that the alleged failure to reinstate/discharge occurred under circumstances giving rise

---

[11] To establish a *prima facie* case of gender or pregnancy discrimination, a plaintiff must establish that: (1) she is a member of a protected class; (2) she was performing her duties satisfactorily; (3) she was discharged or suffered an adverse employment action; and (4) her position remained open and was ultimately filled by a non-pregnant employee. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir. 1995). In the alternative, a plaintiff may satisfy the fourth prong by showing that her discrimination "occurred in circumstances giving rise to an inference of unlawful discrimination." *Id.; Kerzer v. Kingly Mfg.,* 156 F.3d 396, 401-02 (2d Cir. 1998).

to an inference of unlawful discrimination or FMLA retaliation.[12]  Such an inference may be created with either direct or circumstantial evidence, both of which is in short supply in this case. First, with respect to direct evidence, Plaintiff cannot point to any documents, comments or other "smoking gun" evidence that demonstrate that she was discharged in response to her leave, nor does the record contain anything indicating that bias against pregnant women, mothers, or women was the real reason for her discharge.

Similarly, there is a notable dearth of supporting circumstantial evidence of unlawful discrimination or retaliation.  For example, Plaintiff cannot identify any employees, male or female, who were treated more favorably than was she at the conclusion of her FMLA leave. Corrigan Tr. 89: 8.  Indeed, Plaintiff cannot even identify an employee who took an extended leave of absence, nor can she identify a single employee who, unlike her, was offered a job transfer or other position following a territory consolidation.[13]

Lacking evidence of any type of differential treatment, Plaintiff has attempted to convert three routine inquiries made by Mr. Mahoney concerning her child care arrangements into discriminatory comments.  The first alleged comment occurred over lunch in Boston on June 26, 2002. During this conversation, Mr. Mahoney told Ms. Corrigan that when she returned to work from her leave, that she should be prepared to travel four days a week,[14] and that she should ensure that she had appropriate child care to accommodate this schedule.  Corrigan Tr. 55:1-6. However, as Plaintiff relates this conversion, there is nothing discriminatory about Mr.

---

[12] The fourth element of a *prima facie* case is sometimes phrased as replacement by a non-pregnant employee.  This test should not apply where, as here, Plaintiff was not pregnant and therefore not be a member of the protected class when the alleged discriminatory decision was made.

[13] To the contrary, the record establishes that Lee Smith and Karen Emdee were discharged without a right to transfer following the consolidation of their territories. Bell Tr. 56:12-14.

[14] Mr. Mahoney brought this issue up because he was concerned that Plaintiff and the other account executives around the country were not seeing enough of their customers.  Mahoney Tr. 101:15-25; 102:1.

Mahoney's question:

> Q    Tell me about your conversation about what Mr. Mahoney said about having children.
>
> A    That was pretty much it.  You know that this [childbirth] is going to change your life, it's a very big deal.
>
> Q    And with respect to your work, did he discuss the impact of children on your work?
>
> A    I don't think I entered into the conversation much further than that, from him saying that, I just said I'm ready to work, that's pretty much where I went with that.
>
> Q    Okay, let me just, if we can just be a little bit more specific here, did Mr. Mahoney say having children, you're not going to be able to work if you have children, or you're not going to be able to travel with children?
>
> A    Not to my knowledge.
>
> Q    Did he question your ability to travel with children?
>
> A    I guess if you say you must be prepared to come back and travel, are you going to have, you know, get yourself, make sure you have daycare,[15] yes, *I guess I took that as a question*, questioning my ability.

Pl. Tr. 55:14-56:17 (emphasis added).

The childcare issue surfaced again three months later, in early October (a month before Plaintiff was scheduled to return to work), when Mr. Mahoney, in connection with a discussion about Plaintiff's return to work, asked "have you gotten day care for your daughter yet?" Pl. Tr. 87:12-15.  Ms. Corrigan response was that she was "working on it," which suggested to Mr. Mahoney that she might not be prepared to return to work on her scheduled start date.  Pl. Tr. 87:15.  In a follow-up phone call later that month, Mr. Mahoney "asked me again, you know, so, is daycare all set, you know, come in, and then we went over why I would be coming into the city, what time" and other logistics. Pl. Tr. 90: 25  Ms. Corrigan responded that she had made day care arrangements, so the two continued to discuss the details of her trip into the city to Defendant's headquarters.  Notably, Ms. Corrigan does not allege that Mr. Mahoney brought up

---

[15] At the time of this conversation, Ms. Corrigan was unmarried. Pl. Tr. 192:10.

the topic of child care again once she confirmed that such arrangements were in place.

Plaintiff's concern with these comments appears to be her unfounded assumption that Mr. Mahoney would not have asked male employees about their child care arrangements. However, when asked if she had any evidence to support this conclusion, Ms. Corrigan admitted that she did not know any other Account Executives who had taken parental leave, nor did she know whether Mr. Mahoney had ever asked a male Account Executive about his child care arrangements. Corrigan Tr. 89: 2-19. Instead, Ms. Corrigan conceded that she was just "assuming he would not ask another male" about his child care arrangements. Corrigan Tr. 89: 17-19.

Clearly, Plaintiff's rank speculation, however, cannot be used to create an inference of discrimination. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Nor do Mr. Mahoney's isolated comments, standing alone, do the job. On their face, these comments don't indicate anything more nefarious than a manager who wanted to ensure that there were no impediments to his employee's return to work. As such, they are insufficient to establish discriminatory intent. *See, Bond v. Sterling, Inc.*, 77 F. 3d 300, 304 (N.D.N.Y. 1999) (holding that comment that "we are not a family oriented company, we are a business" is not sufficient, in and of itself, from which to infer discriminatory animus.")[16]

---

[16] Also underlying Ms. Corrigan's claim is her assertion that Mr. Mahoney selectively imposed the four day a week travel schedule due to her pregnancy, gender, or her impending FMLA leave. This allegation is also sheer speculation. Indeed, when asked at her deposition whether four days of travel per week was the norm at Polo, Ms. Corrigan testified that she did not know what the norm actually was. Pl. Tr. 60:12-15. However, when presented with a job description that explicitly required six in-store visits per year for each of Ms. Corrigan's 100-odd accounts, she admitted that Mr. Mahoney's travel demands were far from new or unusual:

    Q    So I don't have a calculator here, but if we do the math, Mr. Mahoney's four day a week travel requirement wasn't new at all, was it?
    A    No.
    Q    And this job description presumably went to male and female account executives?
    A    Presumably.

While the burden of establishing a *prima facie* case is not onerous, a plaintiff must present something more than mere speculation to support a claim of wrongful conduct. Because Plaintiff has not, summary judgment should be granted on Plaintiff's claims.

**D.    Polo's Legitimate Non-Discriminatory Reason For Discharging Corrigan**

Defendant asserts, and the record evidence establishes, that Plaintiff's position was eliminated as part of a territory consolidation. This is a legitimate business reason, sufficient to counter Plaintiff's *prima facie* case. *Valenti v. Carten Indus.*, 1997 U.S. Dist. Lexis 19722, *8 (D. Conn. 1997).

**E.    There Is No Evidence of Pretext**

Ms. Corrigan contends that Defendant's proffered explanation is mere pretext, masking the true discriminatory and/or retaliatory reason for her discharge/lack of reinstatement. To support this contention and defeat summary judgment, Corrigan must establish that Defendant's explanation for her discharge is not only false, but also that unlawful discrimination or retaliation was the true motivation for Defendant's actions. *Bruno*, 2004 U.S. Dist. LEXIS 23848. Based on the record evidence, Ms. Corrigan has not and cannot satisfy her burden.

Simply put, Plaintiff has failed to produce *any* tangible evidence to suggest that Polo's decision to discharge her was pretextual and that it was truly motivated by her gender and/or pregnancy or FMLA retaliation. Indeed, all Plaintiff has done is attack the wisdom of selecting her for layoff instead of another Account Executive, and to offer unsupported speculation about Mr. Mahoney's reasons for discharging her. Although Defendant stands by its decision to eliminate Ms. Corrigan's position instead of Mr. MacFarlane's or Mr. DeMarino's, even if this was a bad judgment call, as Ms. Corrigan contends, "evidence that an employer made a poor

---

Pl. Tr. 60:12-62-13. Oddly, Plaintiff complains about this comment despite her assertion that she had no problem conceptually with a 4-day a week travel schedule. Pl. Tr. 63:5-7

business judgment is generally insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons." *Mauro v. Southern New England Telecomm.*, 46 F. Supp. 2d 181, 188 (D. Conn. 1999), citing *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir. 1988). Instead, a Plaintiff must offer facts demonstrating that the decision in question was not just faulty, but also discriminatory or retaliatory. Plaintiff has utterly failed at this task. For all these reasons, summary judgment should be granted to Defendant on these claims.

## CONCLUSION

As is fully explained in the foregoing, Defendant is entitled to judgment in its favor as a matter of law. Plaintiff cannot establish viable claims of gender or pregnancy discrimination or retaliation under the FMLA, nor can she establish that she was entitled unconditional reinstatement. Defendant, therefore, respectfully requests that this Court grant summary judgment, and dismiss the Amended Complaint in its entirety.

Dated: New York, New York
      December 23, 2004

**LITTLER MENDELSON, P.C.**

By: _____
     Christina L. Feege (Fed. Bar No. CT24872)
     Attorneys for Defendant
     885 Third Avenue, 16th Floor
     New York, New York 10022
     (212) 583-9600
     cfeege@littler.com

## AFFIRMATION OF SERVICE

STATE OF NEW YORK    )
                     )        ss:
COUNTY OF NEW YORK   )

**Raquel L. Davis**, affirms the following under penalties of perjury:

1.      I am not a party to this action, am over the age of eighteen years and reside in Queens, New York.

2.      On December 23, 2004, I served the Memorandum of Law in Support of Motion for Summary Judgment and the Affidavit of Kate Mahon-Snow in the following instant case by delivering the same via electronic mail and Federal Express to the person(s) at the address indicated below:

> Lisa Zaccardelli, Esq.
> LEVY & DRONEY
> 74 Batterson Park Road
> Farmington, CT 06032

3.      I have read the foregoing statement and I certify that it is true and correct; I am aware that if this statement is willfully false, I am subject to punishment.

Dated:  New York, New York
         January 3, 2005

                                          Raquel L. Davis