UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALEXIS CORRIGAN, | : | CIVIL ACTION NO |
| Plaintiff | : | 3:03 CV 230 (SRU) |
| | : | |
| V. | : | |
| | : | |
| POLO RALPH LAUREN, | : | FEBRUARY 8, 2005 |
| Defendant | : | |

### PLAINTIFF ALEXIS CORRIGAN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT POLO RALPH LAUREN'S MOTION FOR SUMMARY JUDGMENT

I.     INTRODUCTION.

The Plaintiff, Alexis Corrigan ("Plaintiff" or "Ms. Corrigan") hereby files this Memorandum of Law in Opposition to Defendant Polo Ralph Lauren's Motion for Summary Judgment as there are genuine issues of material fact as to whether (1) the Defendant failed to restore the Plaintiff to her position as an Account Executive on November 4, 2002, upon her return from a sixteen week maternity leave; (2) interfered and/or with her entitlement to that leave when she was involuntarily terminated on November 12, 2002; (3) discriminated against Ms. Corrigan on the basis of her sex, female, and pregnancy in violation of 42 U.S.C. §2000, *et seq.* and 46a-60(a)(1) and 46-60(a)(7)

The undisputed evidence reveals that Plaintiff's position was not eliminated under the auspices of a job consolidation but was instead a carefully devised rouse designed to terminate Plaintiff's employment in retaliation and interfering with her rights for her taking FMLA leave for the birth of her child and based upon her pregnancy and sex.

II.     COUNTERSTATEMENT OF MATERIAL FACTS.

The Plaintiff was an Account Executive with the Defendant Polo Ralph Lauren from 1996 to November 12, 2002, when she was summarily terminated from her employment under the auspices of a job elimination.  (Amended Complaint, ¶ 13)(Corrigan 12/22/03 Tr., p. 187, Exhibit A[1])   At the time of her termination, Ms. Corrigan had completed a sixteen week maternity leave from the Defendant in order to give birth to her child. (Amended Complaint, ¶¶ 29-34)(Corrigan 12/22/03 Tr., p. 195)(Exhibit B, e-mail of Alexis Corrigan)    The Plaintiff had worked as an Account Executive for Polo Golf covering the New England territory, including Connecticut, Massachusetts, Rhode Island, Vermont, Maine, New Hampshire and parts of upstate New York.   (Amended Complaint, ¶ 12)(Corrigan 12/22/03 Tr., pp. 8-9) Ms. Corrigan routinely had contacts at clubs across the Northeast. Ms. Corrigan's territory was restructured in 2000 with the

---

[1] All cites to Corrigan deposition testimony shall be designated as Exhibit A.

merging of the men's and women's division resulting in the Defendant reducing her number of accounts (Corrigan 12/22/03 Tr. pp. 9-10)     Mr. Denny DeMarino serviced the "metro area" which encompassed New York City and another newly hired employee, Michael MacFarlane serviced primarily New York and New Jersey.[2]   (Corrigan 1/13/04 Tr., p. 273)(MacFarlane 1/19/04 Tr., p. 50, Exhibit C[3]).   There was no other territory other than the territory that Ms. Corrigan covered which was designated as the Northeast territory.   (Bell Tr., pp. 181-182, Exhibit D[4])(Herfel Tr., pp. 118-119, Exhibit E[5]).

        Ms. Corrigan was responsible for servicing golf clubs in the area, by selling Polo golf products including men's and women's fashions.    As an Account Executive, Ms. Corrigan was given a sales budget and her performance was measured as to all other Account Executives throughout the country. (Corrigan 12/22/03 Tr., p. 21)(Herfel Tr., p. 88)(See Descending Dollar Report attached as Exhibit F).     There was no formal job requirement of traveling four days a week. (Corrigan 12/22/03 Tr., pp. 52-53)  The Descending Dollar Report gives an accurate picture of an employee's performance and as Account Executive ranked

---

[2]  Mr. MacFarlane was hired as an Account Executive in February, 2001.
[3]  All cites to MacFarlane deposition testimony shall be designated as Exhibit C.
[4]  All cites to Bell deposition testimony shall be designated as Exhibit D.
[5]  All cites to Herfel deposition testimony shall be designated as Exhibit E.

against the overall goals of the division.  (Herfel Tr., p. 88)     Exhibit F shows that in May, 2002, Ms. Corrigan was ranked fifth and regularly outperformed the majority of her co-workers as measured against the division goals.  (See Exhibit F) Indeed, at or about the time of her termination, Ms. Corrigan was outperforming the majority of Account Executives in terms of these goals.   (See Exhibit G) Moreover, the Plaintiff has been given strong performance indicators by her accounts.  (See National Sales Awards attached hereto as Exhibit H)[6]

In February, 2002, Ms. Corrigan advised  Andrew Bell, the National Sales Manager of Polo Golf, and her immediate supervisor,  that she was pregnant and that she would continue to work up to her anticipated due date of August, 2002, and maintain all of her job functions and responsibilities.  (Amended Complaint, ¶14)(Corrigan Tr., p. 31)(Bell Tr., p. 133)  Mr. Bell had been Ms. Corrigan's supervisor since 2000 and had completed a Performance Review for the Fiscal 2002 year which gave her a "meets expectations."  (See Performance Review of Andrew Bell attached hereto as Exhibit I)(See also e-mail from Andrew Bell commenting on Ms. Corrigan's performance for Fiscal Year 2002 attached hereto as Exhibit J)(Bell Tr., pp. 178-179)

---

[6] The Defendant annexed subsequent to its papers, "customer complaints."  These were not part of the Plaintiff's personnel file, but part of a file maintained by Scott Mahoney on Ms. Corrigan (Mahoney Tr., p. 256)

On April 25, 2002, the Defendant announced a transition in its organizational management structure.  (See Exhibit K)(Amended Complaint, ¶4) Mr. Scott Mahoney ("Mahoney") would assume the position of National Sales Manager with seventeen Account Executives reporting to him.   Mr. Bell would move to Director of Operations.  (See Exhibit K)  As Exhibit K shows, prepared in April, 2002, and carried forward through July, 2003, this job alignment reflected an organizational change in the structure of top management, and continues to represent through July, 2003, that there would continue to be seventeen Account Executives reporting to Mahoney.   (Bell Tr., p. 30)(Exhibit K)      There is no indication on this document of any plans to consolidate territories of Account Excecutives or the need to eliminate an Account Executive position because of expenses.  (Bell 1/8/04 Tr., pp. 41-43)(Herfel Tr., p. 32)  There are in fact no documents, no strategic plans, no financial documents, or other Memorandum including any documents drafted or prepared by Mr. Bell which reflect any need to consolidate or eliminate an Account Executive position in the Northeast.     To the contrary, the Organizational Plan indicates the intent to maintain all Account Executives.[7]   (Bell 1/8/04 Tr., pp. 106-107)(See Exhibit K)

---

[7]  The Defendant attaches an Organization Chart reflecting sixteen Account Executives.  This is a document dated November, 2003, almost a year after Plaintiff's termination, and is not indicative of the organizational

In April, 2002, Bell announced his plans consistent with Exhibit K to move to the Director of Operations position with Mahoney moved into the National Sales Manager position.  (Amended Complaint, ¶ 15)   On April 15, 2002, Mr. Andrew Bell advised Mr. Mahoney that Ms. Corrigan was pregnant and would be taking a maternity leave and of her anticipated due date.   (Amended Complaint, ¶15)(Bell 1/8/04 Tr., p. 140)    Although Mahoney did not officially assume the position until June, 2002, the Plaintiff began reporting to Mahoney almost immediately.   (See Amended Complaint, ¶16)

At no time did Mr. Bell instruct or otherwise advise Mahoney of any plans to consolidate the Northeast (Mahoney 2/27/04 Tr., p. 61, Exhibit L[8])(Bell 1/8/04 Tr., 52)   Indeed, according to Mahoney the first time he discussed the idea of a territory elimination was at some point in the fall of 2002.   (Mahoney Tr., pp. 131-132)[9]   At no time when Mahoney assumed the position in April, 2002, through September, 2002, is there no documentary evidence that Mahoney was instructed to eliminate or otherwise considered consolidating a position in the Northeast

structure at the time of Plaintiff's pregnancy or her return from maternity leave.   The Defendant also points to the review of Mr. Mahoney dated December, 2002.  Of course this is after the termination of Ms. Corrigan.  There is no document which predates her request for maternity leave or her going on maternity leave that discusses any reason to consolidate territories in the Northeast.  In fact, the only documents provided indicate a territory consolidation for the Southwest.  (See Exhibit FF, e-mail from Mr. Bell)

[8] All cites to Mahoney deposition testimony shall be designated as Exhibit L.

[9] The Defendant, and in particular Mahoney changes the date of when he first discussed the idea of a territory elimination with Mr. Kirwin.

territory.[10]   (Mahoney 2/27/04 Tr., p. 51)(Mahoney 3/9/04 Tr., p. 188)

From the point Mahoney learned of Plaintiff's request for maternity leave,
he began placing demands on Ms. Corrigan and not other Acount Executives.  For
example, unlike other Account Executives, in or about April 15, 2002, Mahoney
met with Ms. Corrigan to "review her accounts" yet Mahoney did not meet with
other Account Executives including Mr. Michael MacFarlane who had only been an
Account Executive for approximately one year and was handling accounts in New
Jersey and New York.   (See e-mail attached hereto as Exhibit M)(Corrigan
12/22/03 Tr., p. 26)(MacFarlane Tr., p. 53)   Mahoney began questioning Ms.
Corrigan regularly on her accounts where he sought no such information from Mr.
MacFarlane. (Corrigan 12/22/03 Tr., pp. 66-67)(MacFarlane Tr., p. 53)  Mahoney
also demanded Ms. Corrigan produce a travel schedule which he did not ask from
other Account Executives.  (Corrigan Tr., p. 59)(MacFarlane Tr., p. 54)[11]

On May 28, 2002, Mahoney also advised Ms. Corrigan that he wanted to
travel with her to her accounts.   (See Exhibit O)  Again, this had not been done

---

[10] **The Defendant attaches the Affidavit  of Kate Mahon Snow who says  at some point in August, 2002
she was advised of the decision to eliminate a territory, but this is contradictory to Mahoney's
testimony and raises an issue of credibility and of intent.**

[11]  Although Mahoney claims he asked other Account Executives for this information, MacFarlane, the
Account Executive who took over the Plaintiff's accounts during her leave, does not recall any such demands
being placed on him.   Mr. Bell never criticized Ms. Corrigan for the amount of travel.   (Bell  1/18/04 Tr., p.
142)

with other Account Executives.   (Corrigan Tr., pp. 37-43, 48-49)(MacFarlane Tr.,

pp. 53-54)(Affidavit of Kamryn Heilmann attached hereto as Exhibit N)   At this

point, Ms. Corrigan was approximately seven months pregnant.  She advised Mr.

Mahoney that she could not do overnight travel (Corrigan 12/22/03 Tr., p. 32)

because of fetal monitoring every other day at the hospital.    (Corrigan 12/22/03

Tr., p. 35)   Mahoney apparently appeared annoyed that she could not travel

overnight. (Corrigan 12/22/03 Tr., p. 39)    There is no evidence Mahoney

requested any other Account Executive to travel overnight with him, or that he

visited any other accounts including the accounts of those persons who performed

below that of Ms. Corrigan during this time period.    (Corrigan 12/22/03 Tr., p.

43)(MacFarlane Tr., p. 54)

       Ms. Corrigan did go on the trip as a day trip to some of her Northeast

accounts.   It was during this trip that Mahoney questioned Ms. Corrigan's

commitment to her position, and in particular her ability to travel in her job.

(Corrigan 12/22/03 Tr., p. 43)  He advised her that (1) that he did not want her

interferring with the employee who would be covering her territory while she was

out on leave  (Corrigan 12/22/03 Tr., p. 42); (2)  that it would be the new Account

Executive Michael MacFarlane who was currently covering New Jersey and New

York who would cover her territory in her absence (Corrigan 12/22/03 Tr., p. 43);

and (3)  Mahoney also told Ms. Corrigan of her obligation to travel in the position and that she would be expected to travel four days a week when she returned.  He showed skepticism with Ms. Corrigan's ability to return to work, travel four days a week and expressed concern to Ms. Corrigan about her ability to handle a child and a job and questioned her commitment to this articulated schedule.   (Corrigan 12/22/03 Tr., pp. 48-49)   Ms. Corrigan had already been traveling extensively each week (Corrigan 12/22/03 Tr., p. 52) and there was no evidence that she did not travel or meet the commitment or requirements of her job description.  (Bell Tr., pp. 142-143)     There was no such requirement previously placed on Account Executives.  (Corrigan 12/22/03 Tr., p. 64)   And Ms. Corrigan routinely traveled four to five days a week.   (Corrigan 12/22/03 Tr., p. 83)    Although Mahoney stated in an e-mail that he thought the trip went "great" he continued to persist in questioning her commitment to her return to her position.  (See Exhibit O) (Corrigan 12/22/03 Tr., pp. 52, 190-192)   He also required her to advise him of her leave dates (See e-mail from Mahoney attached hereto as Exhibit P) Subsequent to that request,   in a conversation on June 26, 2002, Mahoney told her she needed to be prepared to "come back with child care" and "go back to work four days a week."  (Corrigan Tr., p. 55)

        Approximately one month before the start of her maternity leave date,

Mahoney advised Ms. Corrigan that she needed to sell more to top one hundred clubs.  No such requirement had ever been placed on Ms. Corrigan prior to this point in time, and with only one month before her maternity leave was scheduled to begin she was presented with little, if any, opportunity to begin marketing to these clubs.  (Corrigan Tr., p. 67)(See Review of Andrew Bell dated April 1, 2002 where there is no such requirement in her Performance Review)(See also e-mail Exhibit R including Trip Notes and Travel Log)

On July 19, 2002, Ms. Corrigan contacted Mahoney to advise her that her leave would commence on August 1, 2002.  (Amended Complaint, ¶23) (Corrigan 12/22/03 Tr., p. 68)   Mahoney did not respond either by e-mail or phone call. Thereafter, on July 24, 2002,  Mahoney told Corrigan to return her selling samples back to the showroom.   (Amended Complaint, ¶22)(Corrigan Tr., p. 69)   Ms. Corrigan expressed concern as to why she was being asked to return her selling samples, but nevertheless complied with this request. (Amended Complaint, ¶ 23)(Corrigan Tr., pp. 69, 72-73)

Thereafter, on August 1, 2002, Ms. Corrigan went out on maternity leave. (Amended Complaint, ¶23)    On August 8, 2002, Ms. Corrigan gave birth to her daughter.  At no point in time did Mahoney advise her of problems in her territory or complaints he had received between August 8, 2002 and November 4, 2002.

At no time <u>prior</u> to her maternity leave did Mahoney notify her of the problems with her territory that would lead to her termination.   (Mahoney Tr., p. 126)   There are, for example, no documents, or e-mails which evidence customer complaints until after Ms. Corrigan's scheduled maternity leave.   The complaints are not complaints directed at the Plaintiff's performance, but were responses to a national survey soliciting feedback on areas such as customer service, shipping, and packaging and are relative to the merger of the divisions in 2000 or during the period of time Ms. Corrigan was out on maternity leave(Corrigan 12/22/03 Tr., pp. 163-164)(Corrigan 12/22/03 Tr., p. 172)(See also Affidavit of Alexis Corrigan, Exhibit Q)

During her maternity leave,  Ms. Corrigan contacted Mahoney on at least two separate occasions to advise him she would be returning to work on November 4, 2002.   (Corrigan 12/22/03 Tr., p. 77)    Once again, during those conversations Mahoney informed her that she needed to have day care secured because she would be expected to travel four days a week.    (Corrigan Tr., p. 78) For example, on October 21, 2002, Ms. Corrigan called to check in with Mahoney who questioned her on the importance of traveling her territory and whether she had made the necessary day care arrangements.   Ms. Corrigan reiterated she understood her responsibilities and would be back to work on November 4, 2002,

ready to pick up her accounts.   (Corrigan Tr., pp. 85, 90)   She further requested a

meeting in the showroom on November 7, 2002, so she could review the line, and

be brought up to speed on any changes within her accounts.   (Corrigan Tr., p. 93)

      Instead, however, although Mahoney,  and the Defendant were well aware

of her return to work date when Ms. Corrigan returned to work on November 4,

2002, her accounts had not been transferred back to her and she could not access

the VR link system to view the status of the orders on the accounts.    (Corrigan

Tr., pp. 92-94, 99, 118)(Bell Tr., p. 77)     VR Link is the primary system to review

the status of orders.   (Bell 1/8/04 Tr., p. 77)   AS400 is not a system under which

she could key in orders (Corrigan Tr., pp. 93-96)   When she further contacted her

customers, Ms. Corrigan  was shocked to learn that many of these accounts had

not been advised she would be returning to her position.    (Corrigan Tr., p.

106)(Amended Complaint, ¶30) (Mahoney 3/9/04 Tr., p. 210)   Although,

Defendant was aware of her return to work date, there was no position for to

return.   (Corrigan Tr., pp. 99-100)     Ms. Corrigan had no access to the system in

order to begin to perform her job responsiblities.    In addition, upon contacting Mr.

MacFarlane, he advised Ms. Corrigan that he was going to continue to service her

accounts until late November, 2002.  (Corrigan Tr., p. 101) (McFarlane Tr., pp. 97-

98)  (See e-mail attached hereto as Exhibit Y)   When Ms. Corrigan attempted to

review the status of her accounts with Mahoney, he advised her to wait or do nothing until the accounts were transferred back to her.   (See e-mail attached as Exhibit Y)(Mahoney Tr., pp. 199-202)(Corrigan Tr., p. 116)  Ms. Corrigan was not on the Bookings Report as of November 11, 2002.  (See Exhibit S)

      A.     The Fiscal 2002 Performance Review.

On November 6, 2002, Mahoney contacted Ms. Corrigan to advise her that instead of reviewing the line as previously scheduled, he would be delivering to her a Performance Appraisal for Fiscal Year 2002 and represented this to be a Performance Review of both Andrew Bell, and Scott Mahoney.  (Corrigan Tr., p. 116)

In fact, Mr. Bell had prepared a Performance Appraisal for Ms. Corrigan which indicated a much improved "meets expectations" review and never saw nor reviewed or was aware of a subsequent Performance Appraisal Mahoney had prepared.   (Bell Tr., pp. 115, 168, 178-179)  Although Mr. Bell was Ms. Corrigan's supervisor during Fiscal 2002, Mahoney prepared an evaluation of her performance at some point after August 1, 2002, to reflect performance beyond the Fiscal Year and gave her a "Development Needed" review.  (Corrigan Tr., p. 116)(Exhibit T of Kate Mahon-Snow)(See Review of Mahoney in Fiscal 2002

attached as Exhibit U)[12]   Mahoney further altered the Fiscal 2002 Performance Review of Mr. Michael McFarlane so that it reflected more positive performance.[13] (Herfel, Tr. , p. 103)(Review prepared by Andrew Bell attached hereto as Exhibit V)(Revised Review of Michael MacFarlane by Scott Mahoney attached hereto as Exhibit W)   Although Mahoney conducted a formal review of Ms. Corrigan, he did not deliver, execute or have other Performance Reviews signed by any other Account Executives for Fiscal 2002.  (See Fiscal 2002 Performance Reviews attached hereto as Exhibit X)(Herfel Tr., p. 105)(MacFarlane Tr., pp. 43-45)[14]

On that date, Mahoney met with Ms. Corrigan and said that she was not meeting expectations and would be put on a ninety day performance review plan. (Corrigan Tr., p. 116)  (See Document of Kate Mahon Snow attached hereto as Exhibit T)   Ms. Corrigan, at that point had been out of work on maternity leave for approximately four months and had no access to her accounts or permitted to in any access those accounts.  (Corrigan Tr., pp. 100-101, 116)   Ms. Corrigan spent

---

[12] The Defendant points to a 2002 performance review of Ms. Corrigan as evidence of a "development needed" review.  Initially, the Defendant produced the Mahoney review dated August 1, 2002, as the review of Mr. Bell, and that this was indicative of Ms. Corrigan's performance for Fiscal 2002.   This revised review, delivered to the Defendant on October 31, 2002 (Exhibit U) was the review used to assess Ms. Corrigan's performance on October 31, 2002, during the alleged peer review process.  (See Peer Review dated October 31, 2002)
[13] The Defendant conveniently fails to state that Mahoney changed MacFarlane's review and that this review was utilized in the Peer Review.
[14]  Mahoney claims he reviewed these employees.  However, there are no signed reviews other than Ms. Heilmann's in February, 2003.

time reviewing with Mahoney the fact that she still did not have access to her accounts or VR link or any other system, and had attempted to meet with Mr. MacFarlane to review the status of her accounts.   (Corrigan Tr., p. 116) Mahoney seemed unconcerned by this course of events and made no effort to put MacFarlane in contact with Ms. Corrigan or to transfer her accounts back to her. (Corrigan Tr., pp. 100-101, 116)     At no time during this review, did Mahoney advise Ms. Corrigan that her position was about to be eliminated or that he had no intention of carrying through with the ninety-day review period.    (Herfel Tr., pp. 110-112)(Corrigan Tr., p. 146)[15]

Between the date of the review and her termination date on November 12, 2002,  Ms. Corrigan <u>never</u> resumed the duties of her position.   (Corrigan Tr., pp. 117-118)(Mahoney Tr., p. 199)(See e-mail, Exhibit Y)   On November 11, 2002, Corrigan again e-mailed Mahoney.  Again, she got no response.  (Amended Complaint ¶33)  Although she met with MacFarlane on November 11, 2002 to attempt to transition the accounts back to her, the accounts were still not accessible by VR link.  (Corrigan Tr., pp. 117-118)     She also was not listed on the Bookings recap report as of November 11, 2002 (Exhibit S)   Thereafter, on November 12, 2002, Mahoney called Ms. Corrigan and stated she needed to meet

---

[15]   According to Mahoney, his decision was pending approval.   (Mahoney Tr., p. 206)

with her that afternoon at a diner in Shelton, Connecticut.   When she arrived Mahoney informed her she was being terminated as a result of a position elimination which had nothing to do with her performance.  (See Notes of Scott Mahoney attached hereto as Exhibit Z).  (Corrigan Tr., p. 188)  Ms. Corrigan was the only Account Executive being terminated under the auspices of this reorganization, with MacFarlane continuing to maintain her accounts. (MacFarlane Tr., p. 105)   Plaintiff's accounts remained with Mr. MacFarlane, with some accounts being redistributed to Mr. Denny DeMarino and some accounts to another Account Executive, John Higgenbothon.  (MacFarlane Tr., pp. 104-105)

> B.      The Flawed  Review Process.

Mahoney claimed it was a position elimination having nothing to do with the Plaintiff's performance.   (Corrigan Tr., p. 187)[16]  (See Notes of Mahoney attached as Exhibit Z)    But, in an obvious attempt to construct a reason to choose Ms. Corrigan as the "worst performer" and to classify it as a job elimination among three employees, the Defendant and in particular Mr. Mahoney changed Ms. Corrigan's review for Fiscal 2002 performance year.   Mahoney claimed he made this change based on those things reviewed about Ms. Corrigan's performance year during the time he was her supervisor.   (Mahoney Tr., pp. 218, 222-224)

---

[16] The Defendant now claims that it was her performance that resulted in her position being eliminated.

Mahoney could not identify what parts of her performance he evaluated her on in the approximately three months he was her supervisor from April 25, 2002 to August 1, 2002.  (Mahoney Tr., pp. 126, 222-224)   This review, and not the review of her performance prepared by Mr. Bell, which was a "meets expectations" review, and was the review which represented her performance for Fiscal Year 2002, was utilized by Mahoney in selecting Ms. Corrigan as the candidate to be eliminated.   (Mahoney 3/9/04 Tr., p. 247)    This review was prepared at some point between August, 2002 and October 31, 2002, at the time Mahoney was about to "eliminate a position."     (Herfel Tr., p. 49)

Yet, according to Joy Herfel, President of the Division, there is a specific procedure by which reviews are prepared, executed and delivered.  (Herfel Tr., pp. 41-45)   The process involves the manager preparing the review, it being reviewed by the Review Committee and then delivered to the employee in sit-down meeting and executed by the employee.  (Herfel Tr., pp. 44, 50-51)   The supervisor is expected to prepare the review in May following the end of the Fiscal Year.   The review measures the performance of the employee for that Fiscal Year. The goal setting worksheet is part of the review process, and is to provide the employee with guidelines for their performance for the upcoming year.   The goal setting worksheet sets those budgets for the upcoming year.   Although there may be

additions to the review that are communicated to the employee between the time the review is prepared and ultimately delivered, at no time did Ms. Herfel direct Mahoney to make changes to reviews prepared for the Fiscal 2002 year by Mr. Bell.  (Herfel Tr., pp. 41-46, 106)   Moreover, none of  the other reviews for Fiscal 2002 for Account Executive are signed or delivered during this period of time. Ms. Herfel, in fact, expects her supervisors to follow this process and it would be a failure of that supervisor to not review, deliver and have the employee execute the review (Herfel Tr., p. 51)  There was no goal setting worksheet for Ms. Corrigan prepared by Mahoney for Fiscal 2002 even though there were goal setting worksheets allegedly prepared for other Account Executives.

A "meets expectations" review is not a performance review of an employee which would signal termination.  (Herfel Tr., pp. 86-87)

There are also other measures of the performance including Descending Dollar Reports.  (Herfel Tr., p. 88)(See Descending Dollar Report, May, 2002 attached hereto as F) (Fiscal 2002 Volume Summary, Exhibit AA)  These give an accurate picture of the employee's performance and rate them in descending order among their peers.  (Herfel Tr., p. 88)   Moreover, the normal way of handling a situation in which an employee is considered not to be performing is to put them on a performance improvement plan.    (Herfel Tr., pp. 110-111)

Nonetheless, there is no evidence of the reviews prepared by Mahoney were delivered to the Account Executives.  (Herfel Tr., p. 92)   Moreover, Mahoney prepared a revised review for MacFarlane which showed "improved performance," (Herfel Tr., p. 104)[17] by drastically decreasing his overall sales budget to show improved results.   Mahoney used both the revised reviews of Corrigan and MacFarlane in preparing the peer ranking, (Mahoney Tr., p. 247)(Revised Review Exhibit U) (See Bell Tr., p. 115 saying she had very good peformance in Fiscal 2002)

C.    The Alleged Job Elimination.

Conveniently, as Ms. Corrigan was set to return, the Defendant's claimed reason for Ms. Corrigan's job elimination was a restructing of her position eliminating an Account Executive in the Northeast territory. [18]   According to the Defendant this was part of an overall plan to reduce expenses.   Ms. Corrigan was the only employee who was considered handling the Northeast territory.  (Corrigan Tr., p. 8)(Herfel Tr., 115)[19]    Moreover, a careful review of the Defendant's alleged reasons show them to be false.    Net revenues for Fiscal 2002 increased

---

[17] There is no indication this review was delivered to MacFarlane.   In fact, MacFarlane said he does not recall receiving a review for 2002 which measured his peformance.  At the time of his review, he had only been employed one year.

[18] The Defendant points to a review of Mahoney for Fiscal 2002.  Yet this includes a mid-year review prepared and executed only by Mahoney in December, 2002, after the job elimination. (See Exhibit CC)

[19] There are variances in what the Defendant considers territory.

and the Division was growing.  (See Exhibit BB, Statement of Ralph Lauren)  (See Exhibit AA)(Mahoney 2/2/7/04 Tr., pp. 42-45) over the last Fiscal Year.[20] There was no evidence of any  financial reasons to reduce expense or eliminate the Northeast Account Executive position. (Mahoney Tr., p. 215)    And, there was no strategic plan which discussed the reduction of expenses for the Fiscal 2002 year. (Herfel Tr., p. 90)   There is no goal setting worksheet prepared or signed prior to December, 2002, which outlines the consolidation of the territory.

In an attempt to characterize this as part of an overall plan of consolidation, the Defendant points to other "job eliminations"  in which positions were eliminated and expenses reduced.    First, the Defendant eliminated a female employee, Karen Emde, in the Florida territory in 1999.     Second, with respect to the elimination of a position in the Southwest, it appears Mr. Smith was transferred to another position with the Company.  (See Exhibit FF) and so there was no reduction of expenses.    In addition, Mr. Smith's accounts were dispersed to other Account Executives who were not included in the process of elimination.    There was no consolidation of a position in the Midwest as Mr. Fontaine resigned and no apparent process by which to consider a position elimination.   (See Exhibit DD)

---

[20]  In that time, Mahoney was not managing the Account Executives for Fiscal 2002 (Mahoney 2/27/04 Tr., p. 46)

There is no evidence the Defendant conducted a Peer Review in the case of the Midwest territory or that Mr. Fontaine was the worst performer, or that he would have been selected.

Account Executives were routinely ranked not against their peers in an area, but as to peers across the country. (See Descending Dollar Report, Exhibit F) (Mahoney 2/27/04 Tr. pp. 48-49)(Herfel Tr., p. 120) The Descending Dollar Report shows Ms. Corrigan was outperforming those other Account Executives. According to Ms. Herfel, employees are transferred to other positions in other geographic locations (Herfel Tr., pp. 54-55) And, in the case MacFarlane handled territory during the Plaintiff's maternity leave which he previously had not worked with before her leave.

There is, furthermore, no prohibition in transferring an employee from one territory to another and in fact this happens frequently. (Herfel Tr., pp. 54-55)

According to Mahoney, he prepared the Peer Review ranking on October 31, 2002, one week before Ms. Corrigans' scheduled return. (Mahoney Tr., pp. 247-249) (See Exhibit annexed to Defendant's Memorandum) Mahoney could not identify the specific reasons for assigning Ms. Corrigan these scores or how he could evaluate her based on approximately three months of supervision. (Mahoney Tr., pp. 222-224)

III.    LAW AND ARGUMENT.

A.    The Standard For Summary Judgment Cases.

In this case, the Defendant's Motion for Summary Judgment must be denied as there are genuine issues of material fact as to Plaintiff's job termination was motivated by discrimination.   It is well-settled that a Court may only grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   The moving party bears the burden initially of demonstrating that the evidence contained in the record fails to raise a genuine issue."   See Batka v. Prime Charter, 301 F. Supp. 2d 308 (S.D.N.Y. 2004) citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)    After such a showing, if it is in fact made, the moving party must respond with specific facts showing that there is a genuine issue for trial.  Throughout this inquiry, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.   Schneider v. Feinberg, 345 F. 3d 135, 144 (2d Cir. 2003).

In cases involving claims of discrimination, Summary Judgment is particularly inappropriate because allegations usually require an exploration into

an employer's true motivation and intent for making a particular employment decision.   Darboe v. Staples, 243 F. Supp. 2d 5 (S.D.N.Y. 2003)   When a case turns of the intent of one party, as employment discrimination cases often do, a "trial court must be cautious about granting summary judgment."   Gallo v. Prudential, 22 F. 3d 1219 (2d. Cir. 1994).   Because the employer rarely leaves direct evidence of discriminatory intent, the Court must carefully comb the available evidence for circumstantial proof to undercut the employer's explanations.   Id. at 1224.

> B.   There Are Genuine Issues Of Material Fact As To Whether The
>      Plaintiff Was Restored To Her Position Under 2614(A) Of The FMLA

We begin with an analysis of the Family and Medical Leave Act ("FMLA") under both federal and state law.   The FMLA entitles an eligible employee to a total of "twelve work weeks of leave during any twelve month period, because of a serious health condition."     The employee in Connecticut is allowed sixteen weeks.   See Conn. Gen. Stat. Section 31-55pp.     Under 2614(a)(1) an eligible employee who takes leave shall be entitled on return from such leave (a) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (b) be restored to an equivalent position."     29 U.S.C. Sections 2615(a)(1)(D)(1) and (2) prohibit employers from denying or

interfering with an employee's rights provided under the Act, and from discharging or discriminating against an employee who exercises these rights.  While it is true that an employee who exercises FMLA leave has no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request, upon return from a FMLA leave, the employer is required to restore the employee to the same or equivalent position the employee had at  the time the leave commenced.[21]   29 C.F.R. §825.216(a)

In order to make out a claim for interference with benefits under 29 U.S.C. Section 2614(a)(1) the plaintiff must establish that (1) she is an eligible employee; (2) that she is entitled to take leave under the FMLA; (3) she gave notice of the intention to take leave; and (4) the Defendant denied her a benefit to which she is otherwise entitled.   The burden is on the employer to prove the employee is not entitled to reinstatement of her job because her job would have been eliminated during that same period even if she had not taken leave.   An employer can only escape liability from a failure to restore if it shows by a preponderance of the evidence that the termination would have occurred.[22]    Kosakow v. New Rochelle

---

[21] In Connecticut, Courts impose a strict liability standard.  See Cendant v. Commissioner, 2004 WL 574880 (Conn. Super. 2004)

[22] Under 46a-60(a)(7) of the Connecticut General Statutes the Defendant must show that the failure to return the employee to her position would have been unreasonable to do so.

Radiology Associates, P.C., 88 F. Supp. 2d 199, 209-10 (S.D.N.Y. 2000) vacated

on other grounds, 274 F. 3d 706, 733 (2001)

　　　　The inference or entitlement theory is derived from the FMLA's creation of

substantive rights.   Arban v. West Publishing, 345 F. 3d 390, 403 (6th Cir. 2003)

If any employer interferes with the FMLA created right to medical leave or to

reinstatement following the leave, a deprivation of this right is a violation

regardless of an employer's intent.   See King v. Preferred Technical Group, 166

F. 3d 887, 891 (7th Cir. 1999).  In such a case, the employee only need

demonstrate by a preponderance of the evidence the plaintiff was not restored to

the position she left upon commencement of the leave.  Brenilla v. LaSorsa Buick,

2002 U.S. Dist. Lexis 9358 (S.D.N.Y. 2002)   Rice v. Sunrise Express, 209 F. 3d

1008, 1018 (7th Cir. 2000)

　　　　Here, the overwhelming and undisputed evidence shows that Plaintiff was

not in fact restored to her position upon her return from her maternity leave.  First,

the Defendant was well aware of the Plaintiff's return to work date.  (Corrigan

12/22/03 Tr., pp. 92-94)(Exhibit B)   However, from November 4, 2002, until her

termination on November 12, 2002, the Plaintiff had no access to her accounts nor

had her accounts been transferred back to her.  (See e-mail attached hereto as

Exhibit Y)(Corrigan 12/22/03 Tr., pp. 92-94)   When the Plaintiff attempted to view

the line, this too was cancelled and instead she was given an unscheduled performance review by the Defendant Mahoney.   Ms. Corrigan was not listed on the Booking Report as of November 11, 2002.   When the Plaintiff attempted to secure the return of her accounts from Mr. MacFarlane, she was told he had appointments through November and would not transition these accounts back until that time. (E-mail attached hereto as Exhibit Y)   Moreover, her account contacts had been advised she would not be returning from maternity leave. (Corrigan Tr., p. 107)     At no time prior to her termination on November 12, 2002, did the Plaintiff have access to her accounts to perform her job.   (Corrigan Tr., p. 94)  These are clearly issues of fact as to whether the Plaintiff was ever restored to her position.

Conveniently, the Defendant claims that even if the Court finds the Plaintiff was not restored to her position, it is irrelevant because it would have made the decision to eliminate the position and terminate her employment.   The Defendant further claims it would not look at all Account Executives, even those with decidely lower performance in deciding who to terminate.[23]     The Court, however should carefully scrutinize this "job elimination" as a reasonable factfinder will no doubt

---

[23] An analysis of the Fiscal 2002 reviews shows the overall disparity of how the Plaintiff was rated by Mahoney versus other Account Executives.

conclude the Plaintiff was entitled to return to her position and she would not have been terminated and her position eliminated absent her taking leave.

Specifically, and according to the Defendant's own documentation, Fiscal 2002 was a year of unprecedented growth. (See Filings attached hereto BB)  Mr. Scott Mahoney, the National Sales Manager beginning in later April, 2002 testified he was unaware of any plan to eliminate the Northeast territory position when he assumed the position.  (Mahoney Tr., p. 132) and unaware of any financial consideration or any expenses which need to be reduced.  (Mahoney Tr., p. 132) Furthermore, the Defendant's own documents show <u>no</u> plan to consolidate the Northeast territory position or of any plan to eliminate or reduce expenses.  (See Exhibit K) There was no financial reasons for apparently cutting expenses; in fact, contrary to the Defendant's position, net profits had sustantially increased in Fiscal 2002 and were increasing.  There is no evidence expenses were in fact reduced by terminating the Plaintiff.  The President of the Division, Joy Herfel, could point to no documenation which directed Mahoney in the Fall of 2002 to reduce expenses, or of any strategic plan to reduce expenses.  (Herfel Tr., pp. 22-23)

Moreover, there is no plan, no business documentation of the long standing need to eliminate expenses.  See e.g. <u>Batka v. Prima Charter, Ltd.</u>, 301 F. Supp. 2d 308 (S.D.N.Y. 2004)   Other than the elimination of a position in the

Southwest, there were no other job eliminations between the years of 2000-2002. To the contrary, the documentation prepared by the Division President establishes the intent to maintain seventeen Account Executives.

Indeed, Mahoney conceded he first discussed the territory consolidation in the Fall, 2002 when the Plaintiff was scheduled to return.  (Mahoney Tr., pp. 206-207)   He further did not complete the Peer Review until October 31, 2002 approximately the same date he delivered the revised Review to Kate Mahon-Snow.  (See Exhibit to Defendant's Memorandum)(Exhibit T)    Yet,  Mr. Mahoney could not identify how the Plaintiff was the worst performer.   Moreover, some accounts were transferred to John Higgenbothan an obvious poor performer who did not meet his sales goals.   (Mahoney Tr., pp. 222-224)

Yet, when confronted with Ms. Corrigan's actual performance in Fiscal 2002, as documented by Mr. Bell and for that period prior  to her maternity leave when Mahoney was her supervisor, the undisputed evidence showed Ms. Corrigan outperformed her peers and was outperforming in terms of bookings, MacFarlane and DeMarino  (See Exhibits F and G)    And, it is not part of the process to change reviews and not deliver those reviews to its employees, except the employee who Defendant wanted to terminate, that being Ms. Corrigan.  Contrary to the Defendant, the statement that transfers do not occur, the Division President,

Joy Herfel, testified transfers to different geographic locations occur frequently and did in fact occur with Account Executives assuming other territories.    Even MacFarlane who had <u>no</u> experience in Ms. Corrigan's territory was ultimately given control over those accounts.    Clearly, the Plaintiff has raised genuine issus of fact as to whether 2614 of the FMLA was violated when the Defendant terminated her employment and failed to restore her to her position as an Account Executive.

     B.     <u>The Plaintiff Was Discriminated Against For Her Taking FMLA Leave</u>

     Furthermore, the Court must deny Summary Judgment as to the Plaintiff's claims of interference and/or retaliation with her rights under 2615(1) and (2) of the FMLA and her claims of discrimination based upon her pregnancy and sex under Title VII of the Civil Rights Act and Connecticut General Statutes Section 46a-60, *et seq.*    Indeed, there is direct evidence of discriminatory animus directed at the Plaintiff because of her maternity leave and the Plaintiff's rights were interfered with because of her request for FMLA leave due to the pregnancy.    The <u>clear</u> indisputable evidence is that the decision to terminate the Plaintiff was made after she announced her intention to take a pregnancy leave of absence, and only when it appeared she was ready to return from such leave that her position was "eliminated."    See e.g. <u>Hackett v. Gunderson</u>, 2004 U.S. Dist. Lexis 21919 (N.D.I.L. 2004)    See also <u>Batka</u>, <u>supra</u>; <u>Arban v. West Publishing Co.</u>, 345 F. 3d

390 (6th Cir. 2004)    These actions coupled with the <u>statements</u> made by her supervisor, Scott Mahoney, along with the changes to her performance review and the lack of any financial, business or strategic evidence of the reduction in positions give rise to an inference of discrimination.    See <u>Darboe v. Staples</u>, 243 F. Supp. 2d 537 (S.D.N.Y. 2003); <u>Batka</u>, <u>supra</u>   When corporate decision makers deviate from the established criteria and utilize other criteria that select the plaintiff, a powerful inference of unlawful discrimination arises inference of unlawful discrimination arises.   <u>Glover v. McDonnell Douglas Corp.</u>, 981 F. 2d 388, 392-393 (8th Cir. 1992)   See also <u>Snyder v. Yellow Transportation</u>, 321 F. Supp. 2d 1127 (E.D.M.I. 2004)

Section 2615(a)(1) of the FMLA states that it shall be unlawful for any employer to interfere with, restrain or deny the exercise of or attempt to exercise any right under this chapter.   29 U.S.C. §2615(a)(1).   Section 2615(a)(2) prohibits an employer from retaliating against an employee for exercising those rights. Essentially, the employer is prohibited from considering the taking of said leave as a negative factor in employment decisions.   In the Second Circuit, such claims are evaluated under the <u>McDonnell Douglas</u> standard.  See <u>Potenza v. City of New York</u>, 365 F. 3d 165 (2d Cir. 2004)

Under <u>McDonnell Douglas</u>, a plaintiff must initially establish a prima facie

case of discrimination.   <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

To meet this burden in the context of a FMLA claim the plaintiff must establish (1)

she exercised rights protected under the FMLA; (2) she was qualified for the

position; (3) she suffered an adverse employment action and (4) the adverse

employment action occurred under circumstances giving rise to an inference of

retaliatory or discriminatory intent.  See <u>Potenza</u>, <u>Id</u>. at 168  Once the plaintff has

made her prima facie case, the burden shifts to the defendant to provide a

legitimate non-discriminatory reason for the action.  <u>Id</u>. at 168. [24]

The burden on the plaintiff presenting a prima facie case under <u>McDonnell</u>

<u>Douglas</u> is minimal and the "only purpose served by the prima facie case is to

force the defendant to articulate a non-discriminatory reason for the termination.

It is a rare case in which a defendant will not have preferred such a reason."

<u>Lanahan v. Mutual Life Ins. Co. of New York</u>, 15 F. Supp. 2d 381, 384 (S.D.N.Y.

1998).     A plaintiff's prima facie case combined with sufficient evidence to find

that the employer's asserted justification is false may permit the trier to conclude

that the employer unlawfully discriminated.  <u>Reeves v. Sanderson Plumbing</u>

---

[24]  The Plaintiff must produce evidence that (1) she was pregnant and her employer knew it; (2) she was performing her duties satisfactorily; (3) was discharged and (4) the discharge occurred under circumstances giving rise to an inference of unlawful discrimination.   <u>Quarantino v. Tiffany's Co.</u>, 71 F. 3d 58 (2d Cir. 1995).

<u>Products, Inc.</u>, 530 U.S. 133 (2000).

While it is true that an employee on FMLA leave is not entitled to the accrual of any . . .  employment benefits during any period of leave. . . " and thus, the employee remains susceptible to discharge for a nondiscriminatory reason, this argument presupposes that the employers reasons for terminating the employee are entirely lawful.  The employer's <u>intent</u> is at the heart of the present inquiry.   See <u>Batka</u> at 317.

Moreover, in evaluating pretext, a factfinder could more easily conclude that a discriminatory animus motivated the decision where the issue of pretext turns of the issue of who was involved in the decision to terminate.    While statements voicing doubt that an employee will return to work aftering having a baby do not constitute direct evidence of discrimination, these same statements suffice under the <u>McDonnell Douglas</u> framework to establish pretext.   <u>Hackett v.  Gunderson</u>, 2004 U.S. Dist. Lexis 21912 (N.D.I.L. 2004)  Statements by supervisors carrying the inference that the supervisor harbored animus against protected classes of people or conduct are clearly probitive of pretext.    <u>Hodgens v. General Dynamics Corp.</u>, 144 F. 3d 151, 171 (1st Cir. 1998)

1.      The Plaintiff Has Established A Prima Facie Case Of
        Interference And/Or Retaliation With Her Rights Under The
        FMLA

Clearly, in the instant action, the Plaintiff has met her burden of a prima

facie case of retaliation under the FMLA and on the basis of her pregnancy and/or

sex.  The Defendant concedes that the Plaintiff has satisfied the first three prongs

of the inquiry but claims the Plaintiff has not produced evidence giving rise to an

inference of discrimination.  This is without basis.    First, the Plaintiff was

terminated from her position upon her return from maternity leave.  Evidence of

temporal proximity between an employee's request for leave and her termination is

sufficient to establish an inference of discrimination.   Quinn v. Green Tree Credit

Corp., 159 F. 3d 759, 769 (2d Cir. 1998)

Second, and contrary to the Defendant's claims, there is direct evidence of

discriminatory animus by Ms. Corrigan's supervisor, Scott Mahoney, regarding her

commitment to the position and his voicing concerns about her ability to handle the

position upon her return from her maternity leave.    Specifically, on at least three

separate occasions subsequent to her request for maternity leave, Mahoney

questioned Ms. Corrigan's commitment to return to the position after her maternity

leave.   Indeed, Ms. Corrigan testified:

Q.   Ms. Corrigan, turning back to your complaint, you allege that during this conversation with Mr. Mahoney in Boston that he pressured you that when you returned from your leave that you'd be expected to travel four days a  week.  Do you recall, can you tell me what specifically Mr. Mahoney said with respect to your travel requirements?

A.  I did.

Q.   Can you tell me?

A.  He said that to take the time because when I get, when I returned to my job I would be expected to travel four days a week.

Q.   And what did you say in response?
A.   Not a problem.

Q.   And why do you characterize that statement that you'd be expected to travel four days a week as pressure?

A.   It was never, my travel, when I traveled was not ever a point brought up.  I always got my, went out and traveled my territory.  It was never mandated that we travel four days a week.

She further testified, "He was mandating my schedule, which should have already known anything about me, would have said that I was already out there traveling."  (Corrigan 12/22/03, p. 52, 54, 57, 62-64)   Mahoney did not deny these statements only that he could not recall.   Courts have found such statements when made by the decisionmaker give rise to an inference of discrimination.   See

Hackett, supra.

Mahoney further required her to submit her anticipated leave date in June, 2002.   (Corrigan 12/22/03 Tr., p. 22) (See e-mail attached hereto as Exhibit P) According to the Defendant, this was not typical (Corrigan Tr., p. 22) to require such an early leave date.    He further reiterated the Plaintiff needed to be prepared to come back to work and inquired about whether she had secured day care, while the Plaintiff was out on maternity leave and trying to make the necessary arrangements to return to work.  (Corrigan Tr., pp. 86-91)   The Defendants conclusion of these statements as insignificant is without basis. These are exactly the kind of statements that reveal an inference of discrimination - that is, the intent of the decision-maker.

This is clearly evidence of animus directed at the Plaintiff which would give rise to an inference of discrimination.   See Hackett v. Gunderson, 2004 U.S. Dist. Lexis 21919 (N.D.I.L. 2004)   Mahoney was the individual who ultimately made the decision to terminate Ms. Corrigan.  (Mahoney Tr., p. 252)    Mahoney generated the evidence relating to her being terminated.  This in and of itself rises to an inference of discrimination and is direct evidence of discrimination.  See Hackett v. Clifton Gunderson, LLC, 2004 U.S. Dist. Lexis 21919.

Furthermore, the Defendant and in particular Mahoney changed the Plaintiff's review at the time he was preparing the Peer Review Ranking.  By all objective accounts, the Plaintiff performed at a satisfactory level up to the date of her maternity leave and outperformed Mr. MacFarlane in terms of dollars,  (See Exhibits S, W and I)[25] as well as Mr. Higgenbothan.

Moreover, there is no documentary evidence to support a plan for elimination of this position.[26]    See  Batka, supra.    These facts, coupled with the Defendant's treatment of the Plaintiff and his statements give rise to an inference of discrimination.

2.    The Defendants Articulated Reason Is False And A Pretext For Discrimination

The Defendant's articulated reason a "longstanding plan for job elimination" is false and a pretext to cover up the real reason motivating the Defendant.[27] Indeed, the Defendant has not articulated any legitimate business reason for the Plaintiff's termination as there is no documentary evidence for a job consolidation to reduce business expenses.   There is not even a strategic plan which defines

---

[25] As to Mr. DeMarino, he had been with the Defendant for a significantly longer period of time.  Even Mr. DeMarino, however, missed his overall sales budget for Fiscal 2002.  However, he was never referred to a part of the "Northeast territory."

[26]   For example, Ms. Herfel could point to no strategic plan to eliminate expenses.   There were furthermore no expenses which were reduced.

[27] The Defendant initially said when it delivered the news, it had nothing to do with her performance.

the reduction of expenses as a goal.    Rather, the Defendant used this convenient mechanism as a pretext for the reasons related to Plaintiff's taking of FMLA maternity leave.   The Defendant has offered no evidence to support the need for a position elimination.   It is the intent of the Defendant to select the elimination at this time which is at the heart of the Court's inquiry.

First, the President of the Company, Joy Herfel, was unaware of any such plan to eliminate a position in the Northeast territory.  (Herfel, Tr., pp. 116-117) There was no evidence of increased expenses or a financial downturn in the business.     Indeed, expenses were reduced as net revenues increased.   The Defendant's own documentation shows continuation of seventeen Account Executives through July, 2003.   The falsity of Defendant's explanation is further evidence of a pretext.   Reeves, supra.

In an apparent attempt to make its reasons legitimate, on October 31, 2002, four days before Ms. Corrigan was scheduled to return, Mr. Mahoney prepared a Peer Review which selected Ms. Corrigan.  Contrary to the Affidavit of Ms. Snow it was Mr. Mahoney who prepared the Peer Ranking in a meeting with Ms. Snow and delivered it to her with Ms. Corrigan's revised review.   (See Peer Review dated October 31, 2002). (Mahoney Tr., p. 207-208)    At the time of Plaintiff's termination, she was told it was "a business decision having nothing to do with her

performance."   (Corrigan Tr., pp. 187-188)   Now, with the question of pretext on the line, the Defendant's claims have shifted to the Plaintiff's performance.  Yet, it is this shifting explanation that one sees its obvious and apparent transparency.

As the documentation shows, Mahoney changed Ms. Corrigan's review after she went on maternity leave to a "development needed" review.   He further changed the review of MacFarlane to show improved performance (Herfel Tr., pp. 102-103)[28]   Rather, the financial evidence is overwhelming that reflects positive performance on the part of the Plaintiff compared to her peers as well as the profitability of the division.  The indisputable evidence is that Ms. Corrigan's immediate supervisor, Andrew Bell, rated her as "having a very good year" for Fiscal 2002, and had given her a "meets expectations" review, and that prior to her going out on maternity leave she was ranked ahead of MacFarlane in bookings and in overall dollars.  (See Exhibits F, G, and I)    She was also ahead of the majority of other Account Executives for bookings at the time of her maternity leave.    While Mr. DeMarino had higher overall sales, he had been employed as an Account Executive for over ten years.    Her returns were also well under the Fiscal 2003 goals.  (Exhibit G)[29]    This is hardly evidence of the "worst performer"

---

[28] Moreover, the Defendant initially did not produce the reviews of Mr. Bell.
[29]  A review of other Account Executives reviews show significant weaknesses with their performance.  For

or that she performed below that of Mr. MacFarlane, an employee for one year.

Ms. Corrigan grew her actual sales in mens by 21% and by 28.9% in womens

Fiscal 2002 (Over Fiscal 2001 sales).  (See Performance Review for Ms. Corrigan

I)  Mahoney's assignment of factors is indicative of the pretext.   When pressed on

how he arrived at these rankings, he could point to <u>no</u> evidence to support these

claims.  (Mahoney Tr., pp. 222-224)

     The Defendant next points to Ms. Corrigan's failure to meet sales targets.

Yet, Ms. Corrigan's was closer to achieving her sales budget in Fiscal 2002

compared to MacFarlane and her sales <u>exceeded</u> MacFarlane's overall sales.

(See Performance Reviews,  Exhibits I and V)    Ms. Corrigan's actual sales

dollars were $1,713,424 while Mr. MacFarlane's were $1,539,195 and, were well

above John Higgenbothan an Account Executive who assumed responsibility for

some of her accounts.    He was vague as to the details of his complaints

(Mahoney Tr. pp. 222-224)  These present clear trial issues as to whether the

Defendant discriminated against her under the FMLA.   See <u>Batka</u>, <u>supra</u> p. 315.

     The Defendant's blanket statement of a "lack of growth" is also unavailing.

The Defendants have put forward no evidence of a lack of growth in Ms.

---

example, Tracey Lick was 20% under his budget for Fiscal 2002, yet received an "exceeds expectations.
Likewise, James Shepard, was 21% under budget but received an "exceeds expectations."   And,
MacFarland, also was under his budget, but  received a "meets expectations" review.

Corrigan's territory.    To the contrary, Ms. Corrigan's accounts in sales had grown from Fiscal 2001 to Fiscal 2002.    Moreover, there is no evidence of any growth in the territory by the Defendant MacFarlane.    (Mahoney Tr., pp. 117-121; 122) And, there is no evidence of any growth in Ms. Corrigan's Northeast territory since the alleged job consolidation (Mahoney Tr., p. 122).

As far as the "customer complaints," these complaints were not part of Ms. Corrigan's personnel file.   These complaints were either random surveys conducted in 2000 of the Division, or e-mails while Ms. Corrigan was out on maternity leave and not handling the territory.    The Defendant has produced three surveys over a six year period of employment which focus on customer service and not sales. (See also Customer Surveys attached hereto as Exhibit EE reflecting positive performance.   (Corrigan Tr. pp. 164, 172-173, 176)  There would be no such surveys for Mr. MacFarlane because he was not employed in 2000.   (MacFarlane Tr., p. 80)  The customer surveys were not part of the Plaintiff's personnel file but were housed in Greensboro (See Corrigan Affidavit Exhibit Q) and were never used to evaluate her performance.    As to the complaints which involved e-mails, these conveniently occurred while she was out on maternity leave.    According to Mr. Mahoney, there were no complaints from customers which were problems effecting Ms. Corrigan's performance.  (Bell Tr.,

p. 115) (Mahoney Tr., p. 127)    Moreover, the majority of the "complaints" accorded while she was out on maternity leave and the Defendant's Account Executive, Mr. MacFarlane had serviced the territory.  The Plaintiff was on maternity leave and told not to answer calls.  On September 5, 2002, e-mail Mahoney and Ms. Corrigan had visited the territory in May, 2002.   Mr. MacFarlane testified that Mahoney requested he provide him with the documentation of these issues.  (MacFarlane Tr., p. 80)    The falsity of the Defendant's explanation coupled with the timing of the event and the clear animus of Mahoney "create a pretext for the job elimination."

Clearly there is sufficient evidence from which a jury could find the Defendant had about its reasons for terminating her.   Evidence that calls into question the truthfulness of the employer's stated reason precludes summary judgment.

2.    The Plaintiff Raised Genuine Issues Of Material Fact As To Whether Her Termination Was Motivated By Her Pregnancy And/Or Sex.

For similar reasons, the Plaintiff has met her burden under the Pregnancy Discrimination Act under Title VII and Connecticut General Statutes Section 46a-60(a)(7).  Cases involving claims of pregnancy discrimination are also assessed under the three step burden shifting analysis of McDonnell Douglas.   The Plaintiff

meets this burden under by showing (1) she was pregnant; (2) she was performing her duties satisfactorily; (3) she was discharged; and (4) under circumstances giving rise to an inference of discrimination.     Batka v. Prime Charter, Ltd., 301 F. Supp. 2d 303 (S.D. N.Y. 2004).     Moreover, in Connecticut, under 46a-60(a)(7), the defendant must establish it was unreasonable to restore the Plaintiff to her position.     46a-60(a)(7)(d) provides in part, "it shall be unlawful to . . . fail or refuse to reinstate the employee to her original job or to an equivalent position with equivalent pay . . .  unless, . . . the employer's circumstances  have so changed as to make it impossible or unreasonable to do so."  There is no evidence that it was otherwise unreasonable or impossible to restore the Plaintiff to her position. There is no evidence that the employer's circumstances, that by its financial position changed such that it could not restore the Plaintiff her position.   Contrary to the Defendant's claims, the Court should consider that other similarly situated employees, who had not taken leave or were pregnant, namely other Account Executives whose performance were not considered in the elimination decision. At the time the decision was made, there was only one Account Executive who met the budget in terms of  sales budgets for Fiscal 2002, mens and womens. Seven of the Account Executives met neither of these goals.   Ms. Corrigan met her women's budget, whereas neither MacFarlane nor Higgenbothan met either.

Mr. DeMarino failed to meet his women's budget (See Exhibit X)    Yet, these Account Executives continued to be employed by the Company.    The evidence clearly supports a finding that unlawful discrimination played a motivating role in the decision to undertake this action. See <u>Batka</u>.  See also, <u>Hackett</u>.

There is the evidence that other Account Executives whose performance was below expectations were not terminated or otherwise threatened with termination if their performance did not improve.    Indeed, the reviews for Fiscal 2002 are undated and unsigned.    There is no evidence that the reviews were ever applied, except as to Ms. Corrigan.

Moreover, there is evidence that the Plaintiff was discriminated against because of her pregnancy.  Mr. MacFarlane specifically denied being placed under a four day travel commitment to perform his position.    The Affidavit of Ms. Heilmann further shows he treated nonpregnant females differently than he did females about to go on maternity leave.    These issues are material and go to the heart of the inquiry concerning Plaintiff's termination.

IV.     <u>CONCLUSION</u>.

For all the foregoing reasons, the Plaintiff respectfully requests the

Defendant's Motion for Summary Judgment be denied.


Respectfully submitted,

THE PLAINTIFF
ALEXIS CORRIGAN


By:_____
      Lisa A. Zaccardelli, Esq. for
      LEVY & DRONEY, P.C.
      74 Batterson Park Road
      P.O. Box 887
      Farmington, CT   06034-0887
      (860) 676-3000
      Fed. Bar #ct07983

## CERTIFICATE OF SERVICE

This is to certify that the foregoing has been mailed, postage prepaid on this 8th day of February, 2005, to the following counsel of record:

Christina Feege, Esq.
Scott J. Wenner, Esq.
LITTLER MENDELSON, P.C.
885 3rd Avenue, 16th Floor
New York, NY 10022

_____
Lisa A. Zaccardelli